**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

JANELLE DIETRICH,
              *Plaintiff-Appellant,*

              v.

JOHN ASCUAGA'S NUGGET;
MICHELLE MALCHOW; LARRY
HARVEY; CITY OF SPARKS; SPARKS
POLICE; OFFICER POTTER; and
OFFICER MIKE CARDELLA,
              *Defendants-Appellees.*

No. 06-17135

D.C. No.
CV-04-00468-
BES(VPC)

OPINION

Appeal from the United States District Court
for the District of Nevada
Brian E. Sandoval, District Judge, Presiding

Argued June 10, 2008
Submitted November 20, 2008
San Francisco, California

Filed December 1, 2008

Before: J. Clifford Wallace and Susan P. Graber,
Circuit Judges, and Robert J. Timlin,* District Judge.

Opinion by Judge Graber

---

*The Honorable Robert J. Timlin, United States District Judge for the
Central District of California, sitting by designation.

15849

## COUNSEL

Martin G. Crowley, American Legal Services, Reno, Nevada, for the plaintiff-appellant.

Stanley H. Brown, Jr., Reno, Nevada, and Nicholas F. Frey and Stephen S. Kent, Woodburn and Wedge, Reno, Nevada, for the defendants-appellees.

---

## OPINION

GRABER, Circuit Judge:

Every year, thousands of people attend the "Best in the West Nugget Rib Cook-Off," a multi-day event in downtown Sparks, Nevada. In 2002, Plaintiff Janelle Dietrich attended the event and attempted to register voters and to gather signatures for a political petition. Her activities prompted two incidents that resulted in the filing of this action.

On the first day, a police officer ordered Plaintiff to move to another location, under threat of arrest if she refused to do so. After 30 minutes at the new location she left, but quickly contacted the American Civil Liberties Union and one of the event's organizers. She was allowed by the event's organizer to return the next morning and to conduct her political activities for the remaining days of the event at the original location and a second satisfactory location. On the third day, however, a second police officer cited her for a traffic violation, allegedly in retaliation for publicity about her first-day activities in a local newspaper.

Plaintiff filed suit under 42 U.S.C. § 1983, alleging violations of her First Amendment right to free speech and naming as defendants the police officers, the event's organizers, the Sparks Police Department, and the City of Sparks. The district court held that no constitutional violations had occurred and granted summary judgment to all Defendants. We affirm in part, reverse in part, and remand for further proceedings.

## FACTUAL AND PROCEDURAL HISTORY

Defendant John Ascuaga's Nugget ("Nugget"), a private business that operates primarily in Sparks, Nevada, hosts the annual Best in the West Nugget Rib Cook-Off. The 2002 Cook-Off ("Cook-Off") lasted four days: Thursday, August 29, through Sunday, September 1.[1] The event occurred on Victorian Square, a downtown public area. Pursuant to local regulations, Nugget had applied for, and received, a Special Event Permit for the Cook-Off from Defendant City of Sparks. The permit application stated that it would be necessary to close certain city streets and sidewalks in and around Victorian Square.

At the time of the Cook-Off, Plaintiff was a volunteer for a local political organization, Citizens for the Right to Vote ("Citizens group"). The organization was created in an effort to recall four city council members of the neighboring city of Reno, Nevada. Part of the organization's efforts included gathering signatures for a recall petition and registering voters, and the organization decided to conduct those activities at the Cook-Off.

On Thursday, Plaintiff and other volunteers arrived at the Cook-Off and set up a table on the public sidewalk at Victorian and 14th streets. Defendant Michelle Malchow, an employee of Nugget, approached the group and insisted that they leave. Malchow told the group that, because Nugget had a permit covering the sidewalk in question, the sidewalk was no longer public. The group refused to leave, and Malchow summoned Defendant Sparks Police Officer Mike Cardella. Officer Cardella told the group that, if they did not move to another location, they would be arrested.

---

[1]Because all events took place over those four days, we will refer to days of the week instead of calendar dates.

Officer Cardella then escorted the group, including Plaintiff, to another public sidewalk, outside the boundaries of the Cook-Off, approximately a block and a half away. Plaintiff testified at her deposition that there were no passersby at the new location and that the group was therefore unable to collect any signatures. After 30 minutes, Plaintiff gave up and went home.

On Friday morning, the Citizens group contacted the American Civil Liberties Union and Defendant Larry Harvey, vice-president of Nugget. Harvey assured the members of the Citizens group that they could return to their original location as long as they did not impede pedestrian traffic or pose a safety risk. The Citizens group returned to the original location and a second satisfactory location at the Cook-Off. The organization successfully gathered signatures and registered voters at those two locations for the rest of the long weekend without incident (other than Plaintiff's traffic citation, discussed below). Plaintiff worked at the original location for three days —Friday, Saturday, and Sunday.

On Friday evening, a local newspaper ran a front page article titled "Victorian stage for petition standoff: Group seeking petition signatures and registering voters forced to leave city street." On Saturday, Plaintiff drove her pickup truck, loaded with the organization's signs and table, to the petitioning and registration location. In order to reach the drop-off point, Plaintiff passed a barricade with a "road closed" sign. Malchow and police officers, including Defendant Sparks Police Officer Potter, approached Plaintiff after she arrived at the drop-off point. Officer Potter cited her for failing to obey a traffic device, despite her explanation that a fire officer had allowed her to pass beyond the barricade. Plaintiff parked her truck elsewhere and then rejoined the organization's petitioning and registration effort.

Plaintiff challenged the citation in municipal court but was found guilty. She appealed to the state district court, which affirmed her conviction.

Plaintiff then filed the present action in federal district court under 42 U.S.C. § 1983, seeking monetary damages for two alleged violations of her First Amendment rights.[2] First, she alleges a constitutional violation stemming from her removal from the desired petitioning and registration location on Thursday. Second, she alleges that the traffic citation on Saturday was in retaliation for the local newspaper article, which publicized Thursday's incident.

Plaintiff brings claims against three categories of defendants: (1) a private entity and private persons: Nugget and two of its employees, Harvey and Malchow; (2) municipal entities: the City of Sparks and the Sparks Police Department; and (3) individual police officers. Plaintiff's claim concerning her removal on Thursday is brought against Officer Cardella, and her retaliation claim for the traffic citation on Saturday is brought against Officer Potter.

The district court held that there was no constitutional violation on either day and granted summary judgment to all Defendants. Plaintiff timely appeals.[3]

---

[2]She also brought several other claims but, on appeal, does not challenge the dismissal of those claims.

[3]A second annual event in Nevada factors into this appeal: Nevada Day. Nevada Day is a state legal holiday that celebrates the state's admission to the Union. Nevada Day occurs on October 31, but is "observed on the last Friday in October." Nev. Rev. Stat. § 236.015(1); *see also* http://www.nevadaday.com/. In 2006, Nevada Day was observed on Friday, October 27.

The judgment became final no earlier than September 27, 2006, and the notice of appeal was filed on Monday, October 30, 2006. We inquired at argument whether the notice of appeal was untimely, but the existence of Nevada Day removes our concern. *See* Fed. R. Civ. P. 6(a)(3) ("Include the last day of the period unless it is a . . . legal holiday . . . ."); Fed. R. Civ. P. 6(a)(4) ("As used in these rules, 'legal holiday' means: . . . (B) any other day declared a holiday by . . . the state where the district court is located."). In a separate order filed concurrently with this opinion, we therefore deny the post-argument motion to dismiss the appeal as untimely.

## STANDARD OF REVIEW

We review de novo summary judgment and may affirm on any ground supported by the record. *ACLU of Nev. v. City of Las Vegas*, 333 F.3d 1092, 1096-97 (9th Cir. 2003). "We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Id.* at 1097.

## DISCUSSION

Defendants make two arguments in response to Plaintiff's two § 1983 claims. First, they argue that no constitutional violation occurred. Second, they argue that, even if a constitutional violation occurred, Plaintiff's claims under § 1983 nevertheless fail. The details of this latter argument vary by Defendant. The police officers argue that they are entitled to qualified immunity under *Saucier v. Katz*, 533 U.S. 194 (2001). The private parties argue that they were not acting "under color of state law," as required by 42 U.S.C. § 1983. *See DeGrassi v. City of Glendora*, 207 F.3d 636, 647 (9th Cir. 2000) (setting forth the requirements for private party liability under § 1983). And the municipal entities argue that they did not have a policy or custom of violating the First Amendment. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978) (setting forth the requirements for municipal liability under § 1983).

Because Plaintiff brings both of her § 1983 claims against police officers, we must first determine whether, viewing the facts in the light most favorable to Plaintiff, a constitutional violation occurred. *Saucier*, 533 U.S. at 201. If so, we then must determine whether the claims can proceed against each Defendant.

A.  *First Amendment Claim for Forced Removal on Thursday*

  1.  *Constitutional Violation*

Defendants' removal of Plaintiff from her original location at the Cook-Off on Thursday stands at the intersection of two private parties' First Amendment rights. On the one side, the First Amendment plainly protects Plaintiff's activities— gathering signatures for a political petition and registering voters. *See Morse v. Frederick*, 127 S. Ct. 2618, 2626 (2007) ("Political speech, of course, is at the core of what the First Amendment is designed to protect." (internal quotation marks omitted)). And there is no question that her location—a public sidewalk—is a "quintessential public forum[ ]," where protection for freedom of speech is at its height. *Burson v. Freeman*, 504 U.S. 191, 196 (1992).

On the other side, Defendant Nugget secured a permit from the City of Sparks to hold its Cook-Off on public land. Defendant Nugget argues not that the Cook-Off was a form of political expression, but rather that Nugget wished to exercise its First Amendment right *not* to speak on political issues.[4] The Supreme Court has stated:

> The essential thrust of the First Amendment is to prohibit improper restraints on the voluntary public expression of ideas; it shields the man who wants to speak or publish when others wish him to be quiet. There is necessarily, and within suitably defined areas, a concomitant freedom *not* to speak publicly,

---

[4]There may be a difference, for First Amendment purposes, between situations in which the speaker conveys a political message that itself is protected by the First Amendment and situations, like this one, in which the speaker wishes to refrain from expressing a political message. Because the result in this case is unaffected, we need not, and do not, address that issue.

one which serves the same ultimate end as freedom of speech in its affirmative aspect.

*Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 559 (1985) (internal quotation marks and an emphasis omitted).

[1] To resolve those competing interests, both of which the First Amendment protects, we are guided primarily by the Supreme Court's decision in *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston, Inc.*, 515 U.S. 557 (1995), and our decision in *Gathright v. City of Portland*, 439 F.3d 573 (9th Cir.), *cert. denied*, 127 S. Ct. 76 (2006). As in those cases, Plaintiff's activities occurred in a traditional public forum, where "the government may regulate the time, place, and manner of the expressive activity, so long as such restrictions are content neutral, are narrowly tailored to serve a significant governmental interest, and leave open ample alternatives for communication." *Burson*, 504 U.S. at 197.

In *Hurley*, the Supreme Court addressed the competing interests of the Irish-American Gay, Lesbian & Bisexual Group ("GLIB"), which wished to march in the annual South Boston St. Patrick's Day Parade, and the organizers of the parade, who wished to exclude the organization from participating. The Court first noted the intrinsically expressive nature of a parade and the "equally expressive" nature of GLIB's desired participation in it. *Hurley*, 515 U.S. at 568-70. The Court held that the parade organizers' choice of message "is presumed to lie beyond the government's power to control" and that, in the circumstances of that case, the parade organizers could not be required to allow participation by GLIB. *Id.* at 575.

The Court's decision hinged on the practical aspects of an expressive parade: "[I]n the context of an expressive parade, as with a protest march, the parade's overall message is distilled from the individual presentations along the way, and

each unit's expression is perceived by spectators as part of the whole." *Id.* at 577. In the Court's view, there was no effective way for the parade's organizers to disclaim the views of GLIB as not their own. *Id.* at 579-80. The Court contrasted the situation in *PruneYard Shopping Center v. Robins*, 447 U.S. 74 (1980), where the Court had "sustained a state law requiring the proprietors of shopping malls to allow visitors to solicit signatures on political petitions." *Hurley*, 515 U.S. at 580. *PruneYard* presented a different case because, there, the Court had found that

> the proprietors were running "a business establishment that is open to the public to come and go as they please," that the solicitations would "not likely be identified with those of the owner," and that the proprietors could "expressly disavow any connection with the message by simply posting signs in the area where the speakers or handbillers stand."

*Hurley*, 515 U.S. at 580 (quoting *PruneYard*, 447 U.S. at 87).

We applied *Hurley* in *Gathright*, a case with facts similar to those before us today. As here, the city's code allowed a person to obtain a permit for use of public spaces. *Gathright*, 439 F.3d at 575. The plaintiff, a private citizen, attended "privately sponsored, City-permitted events open to the public" and engaged in behavior that many attendees found offensive. *See id.* (for example, calling women "whores" and wearing a T-shirt reading "Got AIDS Yet?" at an event celebrating tolerance of homosexuality). Pursuant to city code and police policy, the police removed the plaintiff from permitted events on several occasions. *Id.*

We held that the actions of the police violated the plaintiff's First Amendment rights. Although we expressed some reservations, we accepted for purposes of the appeal the city's argument that "its policy is content neutral and that it has a significant interest in protecting the free speech rights of peo-

ple and organizations who have obtained permits to use a public park for an event open to the public." *Id.* at 577 & n.3. Nonetheless, we held that "the policy of allowing permittees unfettered discretion to exclude private citizens on any (or no) basis is not narrowly tailored to the City's legitimate interest in protecting its permittees' right under *Hurley*." *Id.* at 577. We distinguished *Hurley* on the ground that "there [wa]s no risk that Gathright's provocations could be mistaken by anybody as part of the message of the events he protests." *Id.* at 578.

We found persuasive the reasoning of *Parks v. City of Columbus*, 395 F.3d 643, 654 (6th Cir. 2005), a case with very similar facts. *Gathright*, 439 F.3d at 578. Unlike in *Hurley*, the plaintiffs in *Gathright* and *Parks* " 'd[id] not seek inclusion in the speech of another group.' " *Gathright*, 439 F.3d at 578 (quoting *Parks*, 395 F.3d at 651). Instead, each plaintiff was " 'merely another attendee' of a permitted event open to the public, in a public forum." *Id.* (quoting *Parks*, 395 F.3d at 651). Because the city's policy was not narrowly tailored, we did not reach the third prong of the analysis—whether the city's policy left open ample alternative channels of communication. *Id.* at 577.

**[2]** We now turn to the facts of this case. We begin by noting that the government "has a strong interest in ensuring the public safety and order [and] in promoting the free flow of traffic on public streets and sidewalks." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 768 (1994). If Defendants had changed Plaintiff's petitioning and registration location to protect safety or the free flow of pedestrian traffic, we would face a different question. But Defendants do not assert that Plaintiff's activities would cause, or did cause, any safety or traffic concerns at her desired location. Instead, Defendants argue only that their rights under the Special Event Permit allowed them to exclude Plaintiff.

**[3]** As in *Gathright*, 439 F.3d at 577 & n.3, we accept for purposes of this appeal, without deciding, that Defendants'

actions on Thursday were content neutral and that protecting the rights of permittees is a significant governmental interest. But, again as in *Gathright*, we hold that Defendants' actions were not narrowly tailored to the government's interest in protecting the permittee's rights. As in *Gathright* and *Parks*, the permitted event was open to the public, and there is little chance that the public would have viewed Plaintiff's petitioning activities as endorsed by the Cook-Off. To the extent that such a concern existed, Defendant Nugget easily could have disclaimed Plaintiff's activities with a sign or through some other simple mechanism. The reasoning of the Supreme Court in *PruneYard* applies with equal force here:

> The views expressed by [Plaintiff] in passing out pamphlets or seeking signatures for a petition thus will not likely be identified with those of the [Cook-Off]. . . . [A]s far as appears here [Defendant Nugget] can expressly disavow any connection with the message [of Plaintiff] by simply posting signs in the area where [Plaintiff] stand[s]. Such signs, for example, could disclaim any sponsorship of the message and could explain that [Plaintiff is] communicating [her] own messages by virtue of [the First Amendment].

447 U.S. at 87.

**[4]** Defendants' conduct resulting in a *complete exclusion* of Plaintiff on Thursday, for no reason other than the asserted right of the permittees to exclude anyone expressing a political message, violated the First Amendment. We therefore do not reach the question whether ample alternative channels of communication existed. *See Gathright*, 439 F.3d at 577 ("Because the City's policy is not narrowly tailored, we do not reach whether it leaves open ample alternative channels of communication."); *see also United States v. Grace*, 461 U.S. 171, 180 (1983) (rejecting the government's argument that a ban on picketing and leafletting on the sidewalk in front of the

Supreme Court was permissible because "there are sufficient alternative areas . . . , such as the streets around the Court or the sidewalks across those streets").

[5] We therefore reverse the district court's conclusion as a matter of law that no constitutional violation occurred.

2. *Liability of Defendants*

As noted, each Defendant argues that Plaintiff's § 1983 claim cannot proceed, even if there was a constitutional violation. We address below those arguments for the three types of defendants in this case.

[6] Officer Cardella argues that he is protected by qualified immunity. Qualified immunity applies if the constitutional right was "clearly established" so that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. Because the district court held that no constitutional violation occurred, it did not reach the question whether Officer Cardella was protected by qualified immunity. We have held that a First Amendment violation did occur. Therefore, we reverse the summary judgment in favor of Defendant Cardella and remand for the district court to determine, in the first instance, whether he is protected by qualified immunity.

[7] The private parties argue that they were not acting "under color of state law," a requirement for liability under § 1983. *Collins v. Womancare*, 878 F.2d 1145, 1148 (9th Cir. 1989). "Under § 1983, a claim may lie against a private party who 'is a willful participant in joint action with the State or its agents. Private persons, jointly engaged with state officials in the challenged action, are acting "under color" of law for purposes of § 1983 actions.' " *DeGrassi*, 207 F.3d at 647 (quoting *Dennis v. Sparks*, 449 U.S. 24, 27-28 (1980)). "However, a bare allegation of such joint action will not overcome a motion to dismiss; the plaintiff must allege facts tending to

show that [Defendants] acted under color of state law or authority." *DeGrassi*, 207 F.3d at 647 (internal quotation marks omitted).

**[8]** Here, Plaintiff's bare allegation that "[t]he defendants acted in concert in . . . removing [P]laintiff and other [p]etition gatherers from the public sidewalk" is insufficient to establish joint action. There is no evidence that Defendants Nugget, Harvey, and Malchow did anything more than summon police. "[M]erely complaining to the police does not convert a private party into a state actor." *Collins*, 878 F.2d at 1155. We therefore affirm the summary judgment in favor of Defendants Nugget, Harvey, and Malchow.

**[9]** The municipal entities argue that they are not liable because there is no municipal policy or custom of excluding persons from permitted events on public land. Under *Monell*, § 1983 claims may be brought against municipalities only if a plaintiff demonstrates injury resulting from "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." 436 U.S. at 694. There is no respondeat superior liability. *Id.* at 691. We have stated

> four conditions that must be satisfied in order to establish municipal liability for failing to act to preserve constitutional rights: (1) that the plaintiff possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and (4) that the policy is the moving force behind the constitutional violation.

*Van Ort v. Estate of Stanewich*, 92 F.3d 831, 835 (9th Cir. 1996) (internal quotation marks omitted).

**[10]** Plaintiff does not point to any portion of the Sparks Municipal Code that prohibits or restricts a person's exercise

of his or her First Amendment rights as a matter of city policy. The actions of Officer Cardella on one day, without more, cannot establish a custom, policy, practice, or procedure. Defendants submitted an affidavit from the Chief of Police that the Sparks Police Department had no such custom, policy, practice, or procedure to exclude private citizens exercising their First Amendment rights from specially permitted areas, and Plaintiff failed to rebut that evidence. We therefore affirm the summary judgment in favor of Defendants City of Sparks and Sparks Police Department.

B.    *First Amendment Retaliation Claim for the Saturday Traffic Citation*

**[11]** Plaintiff's second claim for a violation of her First Amendment rights concerns the traffic citation that she received on Saturday from Officer Potter. She argues that she was cited in retaliation for exercising her First Amendment rights. Specifically, she contends that the publication of the newspaper article on Friday evening led to her traffic citation on Saturday.

> To demonstrate retaliation in violation of the First Amendment, [Plaintiff] must ultimately prove first that [Defendants] took action that would chill or silence a person of ordinary firmness from future First Amendment activities. . . . The second requirement is [that] . . . [Plaintiff] must ultimately prove that [Defendants'] desire to cause the chilling effect was a but-for cause of [Defendants'] action.

*Skoog v. County of Clackamas*, 469 F.3d 1221, 1231-32 (9th Cir. 2006) (internal quotation marks and footnote omitted).

**[12]** Plaintiff cannot establish causation. Her only theory is that Defendants read the newspaper article and cited her because of it (and not because she drove past a police barricade with a "road closed" sign on it). But there is no evidence

that Defendants read the newspaper article. Plaintiff did not testify at her deposition that any of the Defendants mentioned it during the incident. She did not depose Defendants to ask them whether they had read the article, let alone whether they cited her because of it.

[13] Furthermore, Defendant Potter plainly had probable cause to cite Plaintiff: She does not dispute that she drove past the police barricade. Although she challenged the citation in municipal court, that court convicted her and the appellate court upheld the conviction. In *Hartman v. Moore*, 547 U.S. 250, 265-66 (2006), the Supreme Court held that, when a plaintiff claims prosecution in retaliation for an exercise of a First Amendment right, the plaintiff must plead and prove that the defendant lacked probable cause. In *Skoog*, we limited *Hartman* to cases involving "retaliatory prosecution claims"; failure to plead and prove probable cause is therefore not dispositive with regard to " 'ordinary' retaliation claim[s]." *Skoog*, 469 F.3d at 1234.[5] This is not a retaliatory prosecution claim. Under *Skoog*, then, the fact that Defendants had probable cause is not dispositive. But it undoubtedly "ha[s] high probative force." *Hartman*, 547 U.S. at 265.

In *Skoog*, we held that the retaliatory First Amendment claim survived summary judgment when there was barely enough evidence to conclude that there was probable cause, while there was strong evidence of a retaliatory motive. *See* 469 F.3d at 1231 (holding that, "[a]lthough it is a close question, we conclude that" sufficient evidence existed to support a finding of probable cause); *id.* at 1225-26 (recounting the strong circumstantial evidence of retaliatory motive). Espe-

---

[5]We have acknowledged that a majority of circuits that had considered the issue had declined to limit *Hartman* in that manner. *Skoog*, 469 F.3d at 1232 & n.31; *see also Beck v. City of Upland*, 527 F.3d 853, 864 (9th Cir. 2008) (expanding the reach of *Hartman* to certain Fourth Amendment cases because we saw "no reason to limit *Hartman*'s probable cause requirement solely to First Amendment retaliatory arrest and prosecution cases").

cially given the importance of "protecting government officials from the disruption caused by unfounded claims," *id.* at 1232, this case—which has very strong evidence of probable cause and very weak evidence of a retaliatory motive—falls outside the reach of *Skoog*. Importantly, if it did not, then nearly every retaliatory First Amendment claim would survive summary judgment. There is almost always a weak inference of retaliation whenever a plaintiff and a defendant have had previous negative interactions; holding that this case survives summary judgment would provide almost no "protect-[ion for] government officials from the disruption caused by unfounded claims." *Id.*

**[14]** We conclude that no reasonable juror could find from the undisputed facts that Defendants acted in retaliation for Plaintiff's First Amendment activities when Officer Potter gave her a traffic citation. We therefore affirm the district court's summary judgment to all Defendants on this claim.

## CONCLUSION

We reverse summary judgment in favor of Defendant Cardella concerning his coerced removal of Plaintiff to an alternative location on Thursday, August 29, 2002. We remand that claim for the district court to determine, in the first instance, whether Defendant Cardella is protected by qualified immunity or whether, instead, factual issues remain for trial. We affirm summary judgment in favor of all other Defendants.

AFFIRMED in part; REVERSED in part and REMANDED. All Defendants, except for Cardella, shall be awarded costs on appeal. On the claim against Cardella, the parties shall bear their own costs on appeal.