# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MADHURI PATEL, individually and
on behalf of A.H., a
developmentally disabled minor,
       *Plaintiff-Appellant,*

v.

KENT SCHOOL DISTRICT, a
Washington municipal corporation;
FRANCINE WILHELM; KENT YOUTH
AND FAMILY SERVICES, a
Washington corporation and
healthcare provider; MARNEE
CRAWFORD, a healthcare provider;
DENNIS BALLINGER, a healthcare
provider,
       *Defendants-Appellees.*

No. 10-35430

D.C. No.
2:09-cv-01223-JCC

OPINION

Appeal from the United States District Court
for the Western District of Washington
John C. Coughenour, District Judge, Presiding

Argued and Submitted
March 10, 2011—Seattle, Washington

Filed July 11, 2011

Before: Raymond C. Fisher, Ronald M. Gould, and
Richard C. Tallman, Circuit Judges.

Opinion by Judge Tallman

**COUNSEL**

David P. Moody, Marty D. McLean, Shayne C. Stevenson (argued), Hagens Berman Sobol Shapiro LLP, Seattle, Washington, Lafcadio H. Darling, Mikkelborg, Broz, Wells &

Fryer PLLC, Seattle, Washington, for plaintiff-appellant Patel.

Mark S. Northcraft, Andrew T. Biggs, Sam B. Gorden (argued), Northcraft, Bigby & Biggs, PC, Seattle, Washington, for defendant-appellee Wilhelm.

## OPINION

TALLMAN, Circuit Judge:

A.H., a developmentally disabled high-school student, had several sexual encounters with another developmentally disabled student in a school bathroom. Her mother alleges these encounters were the result of the school's failure to properly supervise A.H. We must decide whether the mother, individually and on behalf of A.H., has a cognizable Fourteenth Amendment due process claim against A.H.'s special-education teacher. The district court found she did not and granted summary judgment to the teacher. We agree and affirm.

The Fourteenth Amendment's Due Process Clause generally does not require government actors to protect individuals from third parties. As we hold below, neither of two exceptions to this general rule—the "special relationship" exception or the "state-created danger" exception—applies here. If A.H. and her mother have viable claims, those claims arise under state tort law, not the federal Constitution.

### I

### A

A.H. is a former student at Kentridge High School (KHS) in the Kent School District (Kent, Washington). Her mother

is plaintiff-appellant Madhuri Patel. At age three, A.H. was diagnosed with developmental disabilities, including cognitive and intellectual delays. She is classified as mildly mentally retarded. A.H. spent her entire school career in special education within the Kent School District.

During the relevant time, A.H.'s disabilities affected her day-to-day life in various ways.[1] She was sometimes unable to complete basic tasks like holding her eating utensils correctly, blowing her nose, and zipping her clothes. Socially, A.H. had difficulty maintaining an appropriate physical distance from other people, refraining from talking about personal or embarrassing things, and conveying an age-appropriate understanding of etiquette. Patel alleged that her daughter frequently was "not aware of the potential danger of situations and [did] not necessarily use caution when encountering risky social situations." Patel also worried that A.H. would often attempt to fit in with her peers by allowing herself to be easily manipulated or mistreated.

In April 2006, A.H.'s freshman year at KHS, Patel discovered a series of troubling emails between A.H. and three other students. Patel learned the students were coercing A.H. to steal money from Patel's purse. The emails also contained several graphic sexual references, particularly between A.H. and a boy named Eric. Patel gave the emails to school administrators, who concluded after investigation that Eric "was extorting money from [A.H.] but no sexual encounters had occurred at school." The three students were suspended, and Eric never returned to KHS.

A month after Patel discovered the emails, KHS established an Individualized Education Plan (IEP) for A.H. A.H. was put in a self-contained classroom taught by defendant-appellee

---

[1]Because we are reviewing an order granting summary judgment, we accept as true the facts Patel alleges. *See Tatum v. City & Cnty. of S.F.*, 441 F.3d 1090, 1092 n.1 (9th Cir. 2006).

Francine Wilhelm, a special-education teacher. The school invoked a "no contact" order to prevent any further physical contact between A.H. and other students. School staff were required to escort A.H. to Wilhelm's classroom when she arrived in the morning, to any classes outside Wilhelm's classroom, and to the bus at the end of the day. At a staff meeting discussing the IEP, Wilhelm said she was "closely monitoring [A.H.] with regards to the young men in the class." Wilhelm also said she was "[k]eeping an eye out for social concerns for [A.H.]" The IEP continued for the remainder of A.H.'s freshman year.

When A.H. began her sophomore year in fall 2006, KHS did not immediately resume the IEP. In an email to school administrators, Patel said she was "quite disappointed that [the] school would drop [the] ball on [the] previous arrangement of [A.H.]'s safety plan without including me or my permission." She asked the school to resume the IEP.

In response to Patel's concerns, KHS held a meeting in September 2006. Wilhelm attended this meeting. A representative from Kent Youth and Family Services informed school officials that A.H.'s safety might be compromised if she was left "in any unsupervised times." This included "lunch, passing times, and especially bathroom time." After the meeting, the school agreed to resume the IEP and drafted a written agreement to that effect. According to Patel's declaration, had the school not done so, she would have removed her daughter from KHS.

The incidents leading directly to this lawsuit occurred the following semester, spring 2007. Although KHS's principal, Mike Albrecht, believed A.H. was under "complete adult supervision throughout the entire day," that semester Wilhelm had been allowing A.H. (then age sixteen) to go on her own to a bathroom immediately adjacent to Wilhelm's classroom. At least five times during these unsupervised trips to the bathroom, A.H. had sex with a boy named Matt, another develop-

mentally disabled student in Wilhelm's class. A counselor determined the sex might be "consensual" even though both students were developmentally disabled.

Despite her recognition that the IEP called for constant supervision, Wilhelm believed allowing A.H. to use the bathroom on her own as a sophomore was an important step in fostering her development:

> Our primary charge is to prepare our [special-education] students for transition when they age out or graduate. [A.H.] will be a junior next year, and allowing her to use the restroom . . . would be considered a step toward full transition. . . . [and] toward more independence.

According to Wilhelm, because the bathroom was next-door to her classroom, she could hear students inside talking and the toilets flushing. Wilhelm also claimed she would watch the clock to make sure A.H. did not take too long. Under these circumstances, Wilhelm considered it appropriate to allow A.H. to make quick trips to the bathroom without an escort.

Wilhelm did not know A.H. was having sex with Matt in the bathroom, but she was aware the two potentially had some type of relationship. On Matt's first day at KHS in March 2007, another teacher had emailed Wilhelm to tell her that A.H. was very interested in Matt, talking and laughing with him during class. Wilhelm asked the other teacher to "document the behavior and send it to [her]." Wilhelm also relayed this information to Patel via email. Then, about two months later, a vice principal told Wilhelm that she had seen the two students hugging in the hallway. Wilhelm spoke separately with each student about the incident.

A few days later, Wilhelm saw Matt leave her classroom just a few seconds after A.H. had gone to the bathroom. Wil-

helm "raced out of the room," called to A.H. from outside the bathroom, and escorted her back to class. Wilhelm said A.H. was "very angry" with Wilhelm for "interfering with her." At the school's direction, Wilhelm again emailed Patel to explain the incident. A school official later thanked Wilhelm privately for her "vigilant" efforts.

As it turned out, this second email from Wilhelm to Patel may have been the catalyst in revealing A.H.'s sexual relationship with Matt. After receiving the email, Patel asked her daughter whether she was having a relationship with another student. A.H. admitted she and Matt had sex in the bathroom at least twice. Having heard this, Patel sent two emails to KHS, one to Wilhelm and one to Principal Albrecht. These emails disclosed A.H.'s sexual relationship with Matt and expressed Patel's anger about the situation. In the email to Wilhelm, Patel wrote, "FRANCINE I AM IN SHOCK, [A.H.] WILL NOT COME BACK TO SCHOOL TILL THESE ISSUES [ARE] WORKED OUT." Likewise, in the email to Principal Albrecht, Patel wrote that the school had "not provided [the] supervision [A.H.] needs."

Patel's email to Principal Albrecht also revealed for the first time that, contrary to the results of the school's previous investigation, A.H. and Eric had sex in a different school bathroom during her freshman year. Patel's email ambiguously claimed school officials knew this all along: "She had sex with [Eric] on the bathroom floor in [the] new [building] last year . . . school knows about this as they did their investigation last year."

But as the district court correctly noted, there was no evidence school officials knew that A.H. had sex at school her freshman year until Patel told them so in these spring 2007 emails. Rather, the school's prior investigation had concluded that Eric exploited A.H. for money, but no sex occurred on campus. In an internal email, a school official said, "[We] have met with [Patel] numerous times," she "would not tell us

what happened last year," and "we had no knowledge of [A.H.] having sex." Similarly, Wilhelm herself stated that she and other teachers knew A.H. had done something inappropriate in the bathrooms her freshman year, but they did not know exactly what had happened.

After sending the two emails, Patel removed A.H. from KHS. She reported the sexual encounters to the King County Sheriff's Department. The sheriff's office took a statement from Matt, who admitted he "had sexual relations with [A.H.] at least five times." This lawsuit followed.

## B

Patel filed suit in Washington Superior Court, individually and on behalf of A.H. She brought a variety of state-law claims against the school district and Wilhelm, including negligence and failure to protect. Patel also brought a federal civil rights claim under 42 U.S.C. § 1983. The § 1983 claim, which underlies this appeal, was against Wilhelm only. Without further elaboration, Patel's complaint alleged Wilhelm had violated A.H.'s Fourteenth Amendment rights. Defendants removed the case to the United States District Court for the Western District of Washington on the basis of this federal claim.

In the district court, Wilhelm moved for partial summary judgment on the § 1983 claim. She argued Patel's complaint did not explain how Wilhelm had deprived A.H. of her Fourteenth Amendment rights. In response, Patel countered that Wilhelm had violated A.H.'s due process right to bodily integrity by failing to supervise her trips to the next-door bathroom, causing her to be "repeatedly raped."

The district court granted Wilhelm's motion and dismissed the § 1983 claim, finding as a matter of law that Wilhelm had not deprived A.H. of any federally protected right. The court then declined to exercise supplemental jurisdiction over

Patel's remaining state-law claims. *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726-27 (1966). The court dismissed the state claims without prejudice, leaving them for resolution by the King County Superior Court.

Patel now appeals. We have jurisdiction under 28 U.S.C. § 1291.

## II

We review *de novo* a district court's grant of summary judgment. *Dietrich v. John Ascuaga's Nugget*, 548 F.3d 892, 896 (9th Cir. 2008). Viewing the evidence in the light most favorable to the non-moving party, we must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Id.*

## III

The district court correctly granted partial summary judgment to Wilhelm. Although Patel may still have viable state-law claims against the defendants, her § 1983 claim against Wilhelm fails as a matter of law. *Cf. DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 202 (1989) ("[T]he Fourteenth Amendment . . . does not transform every tort committed by a state actor into a constitutional violation.").

**[1]** To succeed on a § 1983 claim, a plaintiff must show that (1) the conduct complained of was committed by a person acting under color of state law; and (2) the conduct deprived the plaintiff of a federal constitutional or statutory right. *Tatum*, 441 F.3d at 1094. Here, the parties do not dispute that Wilhelm was acting under color of state law. The sole issue is whether Wilhelm deprived A.H. of any federally protected right.

**[2]** "[T]he general rule is that [a] state is not liable for its omissions." *Munger v. City of Glasgow Police Dep't*, 227

F.3d 1082, 1086 (9th Cir. 2000). In that vein, the Fourteenth Amendment's Due Process Clause generally does not confer any affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests. *DeShaney*, 489 U.S. at 196. As a corollary, the Fourteenth Amendment typically "does not impose a duty on [the state] to protect individuals from third parties." *Morgan v. Gonzales*, 495 F.3d 1084, 1093 (9th Cir. 2007).

**[3]** There are two exceptions to this rule: (1) when a "special relationship" exists between the plaintiff and the state (the special-relationship exception), *Deshaney*, 489 U.S. at 198-202; and (2) when the state affirmatively places the plaintiff in danger by acting with "deliberate indifference" to a "known or obvious danger" (the state-created danger exception), *L.W. v. Grubbs*, 92 F.3d 894, 900 (9th Cir. 1996). If either exception applies, a state's omission or failure to protect may give rise to a § 1983 claim.

**[4]** Because Patel's § 1983 claim is based on an omission by Wilhelm—her alleged failure to properly supervise A.H.—Patel can establish a due process violation only if one of these two exceptions applies. To survive summary judgment, then, Patel must raise a material fact question on either exception. She has not done so.

**A**

**[5]** We begin with the special-relationship exception. The Supreme Court formally established this exception in *DeShaney*, 489 U.S. at 198-202. The exception applies when a state "takes a person into its custody and holds him there against his will." *Id.* at 199-200. The types of custody triggering the exception are "incarceration, institutionalization, or other similar restraint of personal liberty." *Id.* at 200. When a person is placed in these types of custody, we allow due process claims against the state for a fairly simple reason: a state cannot restrain a person's liberty without also assuming

some responsibility for the person's safety and well-being. *Id.* at 199-200.

**[6]** Under this exception, the state's constitutional duty arises "not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which [the State] has imposed on his freedom." *Id.* at 200. In other words, the person's substantive due process rights are triggered when the state restrains his liberty, not when he suffers harm caused by the actions of third parties. *Id.* at 195, 200.

**[7]** The special-relationship exception does not apply when a state fails to protect a person who is not in custody. *See id.* at 195-202. In *DeShaney*, for instance, a four-year-old boy was brutally and repeatedly beaten by his father. *Id.* at 191-93. The abuse was reported to the county's department of social services. *Id.* at 192. While monitoring the situation over the following months, social services saw voluminous evidence suggesting continued abuse. During her monthly in-home visits, the boy's caseworker observed several suspicious injuries on his body. *Id.* at 192-93. On her final two visits, the caseworker was told the boy could not see her because he was "too ill." *Id.* Social services twice received calls from the hospital saying the boy had been admitted for injuries doctors believed were caused by abuse. *Id.* Through all of this, social services never took any action. *Id.*

Soon after, the boy was beaten to near-death by his father and suffered severe brain damage. *Id.* The Supreme Court rejected the boy's § 1983 due process claim, holding the special-relationship exception did not apply because the boy was in the custody of his father, not the state. *Id.* at 201. Even though the state had extensive information strongly suggesting abuse, the boy's due process rights were not triggered because he was not in state custody. *Id.* at 200-02.

**[8]** Here, Patel argues A.H. was in state custody while she was at school. Patel emphasizes that Washington requires

mandatory school attendance, Wash. Rev. Code § 28A.225.010(1), and that KHS had a duty to protect A.H. during school hours under the state's *in loco parentis* doctrine. This state tort doctrine requires schools to "anticipate dangers which may reasonably be anticipated" and then "take precautions to protect the pupils" from those dangers. *McLeod v. Grant Cnty. Sch. Dist. No. 128*, 255 P.2d 360, 362 (Wash. 1953). Patel argues this state-law duty created a special relationship under *DeShaney*, thus permitting her federal § 1983 claim.

**[9]** Although we have not yet applied *DeShaney* to the context of compulsory school attendance, every one of our sister circuits to consider the issue has rejected Patel's argument. At least seven circuits have held that compulsory school attendance alone is insufficient to invoke the special-relationship exception. *E.g.*, *Hasenfus v. LaJeunesse*, 175 F.3d 68, 71 (1st Cir. 1999); *Doe v. Hillsboro Indep. Sch. Dist.*, 113 F.3d 1412, 1415 (5th Cir. 1997) (en banc); *Sargi v. Kent City Bd. of Educ.*, 70 F.3d 907, 911 (6th Cir. 1995); *Graham v. Indep. Sch. Dist. No. I-89*, 22 F.3d 991, 993-95 (10th Cir. 1994); *Dorothy J. v. Little Rock Sch. Dist.*, 7 F.3d 729, 732 (8th Cir. 1993); *D.R. v. Middle Bucks Area Vocational Tech. Sch.*, 972 F.2d 1364, 1368-73 (3d Cir. 1992) (en banc); *J.O. v. Alton Cmty. Unit Sch. Dist. 11*, 909 F.2d 267, 272 (7th Cir. 1990). Our sister circuits have reasoned that, unlike incarceration or institutionalization, compulsory school attendance does not restrict a student's liberty such that neither the student nor the parents can attend to the student's basic needs. *E.g.*, *Sargi*, 70 F.3d at 911 (citing cases). Even when school attendance is mandatory, the parents—not the state—remain the student's primary caretakers. *E.g.*, *id.*

**[10]** Going a step further, most of these circuits have expressly held that combining *in loco parentis* duties with compulsory school attendance still does not create a "special relationship." *E.g.*, *Hasenfus*, 175 F.3d at 71; *Doe v. Claiborne Cnty.*, 103 F.3d 495, 510 (6th Cir. 1996); *Dorothy J.*,

7 F.3d at 732; *Middle Bucks*, 972 F.2d at 1368-73. These decisions have emphasized that a state-law obligation does not necessarily create a duty of care under the Fourteenth Amendment. *E.g.*, *Claiborne Cnty.*, 103 F.3d at 510; *see also DeShaney*, 489 U.S. at 202. Applying this bedrock principle, our sister circuits uniformly hold that requiring school attendance does not sufficiently restrict a student's liberty under *DeShaney* to transform the school's *in loco parentis* duties into a constitutional obligation. *E.g.*, *Claiborne Cnty.*, 103 F.3d at 510 (citing cases).

We find particularly instructive the Third Circuit's analysis of this issue in *Middle Bucks*, as it involved facts somewhat similar to ours. *See* 972 F.2d at 1366-67. In that case, one plaintiff was a female student with communicative disabilities. *Id.* at 1366 n.5. She claimed multiple male students sexually molested her in a unisex school bathroom and a darkroom. *Id.* at 1366. She brought a § 1983 claim against the school, alleging several school defendants knew or should have known about these incidents but did nothing to intervene. *Id.*

Affirming dismissal of the § 1983 claim, the Third Circuit refused to apply the special-relationship exception. *Id.* at 1373. The court emphasized that, despite compulsory school attendance and *in loco parentis* status, the student remained in the custody of her parents, not the school. *Id.* at 1370-72. She went home every night, and her parents had the authority at all times to put her in a different school or educate her at home. *Id.* Thus, the school's authority did not "create the type of physical custody necessary to bring it within [*DeShaney*]." *Id.* at 1372.

[11] While we certainly have sympathy for Patel's position as a concerned and caring parent, we decline to depart from this persuasive authority. Compulsory school attendance and *in loco parentis* status do not create "custody" under the strict standard of *DeShaney*. Like the schoolchildren in the cases

cited above, A.H.'s freedom was not restrained by KHS in a manner akin to "incarceration" or "institutionalization." *See DeShaney*, 489 U.S. at 200. A.H. did not live at school; she lived at home with her mother. Although she was statutorily required to attend school *somewhere*, her mother could have removed her from KHS at any time, and in fact did so. *See* Wash. Rev. Code § 28A.225.010(1) (granting parents broad discretion over where and how their children are educated). These facts preclude a custodial relationship.

**[12]** To the extent Patel argues we should distinguish this case because the IEP obligated KHS to guard against A.H.'s special vulnerabilities, *DeShaney* suggests otherwise. In the case of a minor child, custody does not exist until the state has so restrained the child's liberty that the parents cannot care for the child's basic needs. *See DeShaney*, 489 U.S. at 199-201. A tailored educational program for a disabled student does not meet this threshold. *Middle Bucks*, 972 F.2d at 1371-72. KHS's agreement to provide enhanced supervision did not prevent Patel from caring for A.H.'s basic needs. Patel always remained A.H.'s primary caretaker. Even though Patel's care was surely undermined by the school's alleged failure to follow the IEP, that is not our inquiry here. Under *DeShaney*, we are concerned only with whether KHS so restrained A.H.'s liberty that it rendered Patel "*unable* to care for [her]." *See* 489 U.S. at 200 (emphasis added). It did not. Thus, while the IEP may significantly strengthen Patel's state-law negligence claims, it does not give rise to a constitutional duty. *Cf. id.* at 202.

**B**

**[13]** We now consider the state-created danger exception. We first recognized this exception in *Wood v. Ostrander*, 879 F.2d 583 (9th Cir. 1989). Although our case law on the exception is somewhat scattershot, two clear requirements have emerged. *See Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1062 (9th Cir. 2006). First, the exception applies only where

there is "affirmative conduct on the part of the state in placing the plaintiff in danger." *Munger*, 227 F.3d at 1086 (internal quotation omitted). Second, the exception applies only where the state acts with "deliberate indifference" to a "known or obvious danger." *Grubbs*, 92 F.3d at 900.

We do not reach the first requirement here because Patel fails on the second. Even viewing the facts in the light most favorable to Patel, the record does not support her contention that Wilhelm acted with deliberate indifference in neglecting to properly supervise A.H.

**[14]** Deliberate indifference is "a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997). We defined the contours of deliberate indifference in *Grubbs*, 92 F.3d at 898-900. Under *Grubbs*, the standard we apply is even higher than gross negligence—deliberate indifference requires a culpable mental state. *Id.* The state actor must "recognize[ ] [an] unreasonable risk and actually intend[ ] to expose the plaintiff to such risks without regard to the consequences to the plaintiff." *Id.* at 899 (internal quotation omitted). In other words, the defendant "knows that something *is* going to happen but ignores the risk and exposes [the plaintiff] to it." *Id.* at 900. The deliberate-indifference inquiry should go to the jury if any rational factfinder could find this requisite mental state. *See Wood*, 879 F.2d at 588 & n.4.

In a few § 1983 opinions post-*Grubbs*, we have allowed deliberate-indifference theories to proceed to trial. *See, e.g.*, *Kennedy*, 439 F.3d at 1064-65; *Munger*, 227 F.3d at 1087-88; *Penilla v. City of Huntington Park*, 115 F.3d 707, 711 (9th Cir. 1997). Patel argues these cases control the outcome here and require us to reverse summary judgment. We disagree. Deliberate-indifference cases are by their nature highly fact-specific, and the cases cited by Patel are distinguishable.

In *Penilla*, decedent Penilla became seriously ill while sitting on his front porch. 115 F.3d at 708. The first responders to a 911 call were two police officers. *Id.* The officers examined Penilla, found him to be in grave need of medical care, but then inexplicably canceled the request for paramedics. *Id.* They moved Penilla inside his house, locked the door, and left. *Id.* Penilla was found dead on his floor the next day, the result of respiratory failure. *Id.* Emphasizing the officers' disregard for Penilla's immediate and "serious" medical need, we saw a material fact question on deliberate indifference and allowed a § 1983 claim to proceed to trial. *See id.* at 710-11.

In *Kennedy*, the Kennedy family reported to police that their nine-year-old daughter had been abused by their neighbors' mentally unstable son. 439 F.3d at 1057. The Kennedys told the responding officer in detail about the boy's disturbing history of aggravated violence, including lighting a cat on fire and breaking into his girlfriend's house to beat her with a baseball bat. *Id.* at 1057-58. Aware the Kennedys feared a violent response, the officer promised to warn them before he told the neighbors about the allegations. *Id.* at 1058, 1063.

Despite his promise, the officer later spoke with the neighbors without first warning the Kennedys. *Id.* at 1058. When he told the Kennedy mother about his conversation with the neighbors (fifteen minutes later), she became upset. *Id.* The officer promised additional patrols would be provided that night to protect the Kennedys from possible retaliation by the boy. *Id.* But the patrols were not provided, and that same night the boy broke into the Kennedy home and shot both parents. *Id.* We held this evidence created a material fact question on whether the officer acted with deliberate indifference. *Id.* at 1064-65.

Our facts here are critically different. Unlike the police officers in *Penilla*, Wilhelm did not act in a manner contrary to assisting someone in a known, immediate danger. The officers knew Penilla was in grave condition and required prompt

medical attention, yet for some reason did the opposite of what a reasonable person would expect them to do. In fact, the officers made the situation decidedly worse by calling off medical assistance already en route. *Penilla*, 115 F.3d at 708. Wilhelm did nothing similar here. This would be a different case if Wilhelm had known A.H. was about to enter the bathroom with Matt or otherwise be alone with him, yet then stood idly by. To the contrary, Wilhelm had monitored the developing situation between the two students, and once even rushed out of her classroom to prevent a possible incident between them.

As for *Kennedy*, while our case is similar in that Wilhelm made a promise she allegedly failed to keep—supervising A.H. at all times—it is also crucially different because Wilhelm did not know about any immediate risk. In *Kennedy*, the police officer knew the neighbors' son had a history of aggravated violence, including previously breaking into a house to attack someone. He also knew the Kennedys feared swift retaliation once the boy learned of the allegations, which is exactly why the officer promised to provide additional patrols *that night*. Here, on the other hand, Wilhelm knew only that A.H. required extensive supervision and had been involved in past bathroom incidents, the details of which were unknown to Wilhelm. She did not know there was any *immediate* danger in allowing A.H. to briefly use the next-door bathroom alone.

**[15]** Contrary to Patel's argument that our case law precludes summary judgment here, we think the straightforward rules established in *Grubbs* dictate just the opposite. As noted above, *Grubbs* makes unmistakably clear that mere negligence—or even gross negligence—is not enough for deliberate indifference. *See* 92 F.3d at 898-900. The standard is markedly higher, and we see no evidence even hinting that Wilhelm "intend[ed] to expose" A.H. to a risk or otherwise knew "that something [was] going to happen but ignore[d] the risk." *Id.* at 899-900.

A far cry from "ignor[ing]" any risk, Wilhelm was fairly active in protecting A.H. She regularly communicated about A.H. with school officials, other teachers, and Patel herself. She asked another teacher to help her monitor the possible developing relationship between A.H. and Matt. She spoke separately with the two students about their hugging in the hallway. She rushed out of her classroom to prevent an incident between them as soon as she realized they were both gone at the same time. Further, well before this litigation began, Wilhelm gave her colleagues a compelling reason for allowing A.H. to use the bathroom by herself: it was a "step toward [A.H.'s] full transition" to graduating from high school. Taken together, this evidence does not suggest that Wilhelm harbored the requisite mental state of intentionally or knowingly subjecting A.H. to a known or obvious danger. *See id.*

**[16]** At worst, Wilhelm committed a lapse in judgment by allowing A.H. to quickly use the next-door bathroom on her own. Whether these circumstances rose to the level of negligence is a question that will be resolved by a jury in Washington state court. But on this record, no rational factfinder could conclude that Wilhelm acted with deliberate indifference to A.H.'s safety and well-being. Anything less "is not enough" to constitutionalize a state tort. *Id.* at 900.

## IV

**[17]** The district court properly dismissed Patel's § 1983 civil rights claim at summary judgment. The special-relationship exception and the state-created danger exception do not apply in this case. Whatever liability Wilhelm may face, that liability must come from state tort law, not the Fourteenth Amendment. *Cf. Alton Cmty.*, 909 F.2d at 272 (holding that protection for schoolchildren "is best left to laws outside the Constitution"). Patel and her daughter will have their day in court, but it will come in the King County Superior Court, not here.

**AFFIRMED.**