# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
August 5, 2011

Lyle W. Cayce
Clerk

No. 09-60406

JANE DOE, a minor, by and through her next friends,
Daniel Magee and Geneva Magee; DANIEL MAGEE,
Individually and on Behalf of Jane Doe; GENEVA MAGEE,
Individually and on Behalf of Jane Doe, a minor,

                                        Plaintiffs-Appellants

v.

COVINGTON COUNTY SCHOOL DISTRICT, by and through
its Board of Education and its President, Andrew Keys and its
Superintendent of Education, I.S. Sanford, Jr.; COVINGTON
COUNTY SUPERINTENDENT OF EDUCATION, I.S. SANFORD,
Officially and in His Individual Capacity; COVINGTON COUNTY
BOARD OF EDUCATION, by and through its President, Andrew
Keys; ANDREW KEYS, officially and in his individual capacity;
TOMMY KEYES; OTHER UNKNOWN JOHN DOE AND JANE
DOE EDUCATION DEFENDANTS A-Z, also in their official and
individual capacities,[*]

                                        Defendants-Appellees

Appeal from the United States District Court
for the Southern District of Mississippi

Before KING, WIENER, and DENNIS, Circuit Judges.

---

[*] In addition to these Defendants-Appellees, the Plaintiffs-Appellants originally named
Covington County, the Mississippi Department of Education, and the State Superintendent
of Education as co-defendants, but they were dismissed before the district court decided this
case.

No. 09-60406

WIENER, Circuit Judge:

## I. PERSPECTIVE

Plaintiff-Appellant Daniel Magee is the father and next friend, and Plaintiff-Appellant Geneva Magee is the grandmother, guardian, and next friend, of Plaintiff-Appellant Jane Doe (collectively the "Does"). Individually and on behalf of nine-year-old Jane Doe ("Jane"), the Magees sued, inter alia, the Covington County [Mississippi] School District, its Board of Education, its president, and other persons, in their official and individual capacities (collectively, the "Education Defendants"), as well as other known and unknown persons, under 42 U.S.C. §§ 1983 and 1985, alleging violations of Jane's Fourteenth Amendment substantive due-process rights (and various state law violations).

### A.     Question Presented

The question that lies at the core of this appeal is:

Are there circumstances under which a compulsory-attendance, elementary public school has a "special relationship" with its nine-year-old students such that it has a constitutional "duty to protect" their personal security?

### B.     Context

The framework in which the question thus posed must be answered is a construct of not only that which the complaint alleges and asserts but—of equal importance—that which the complaint does *not* allege or assert.

First, the Does have not complained that a school *passively* "stood by and did nothing" when "suspicious circumstances" indicated that it should have protected a student from his *legal guardian*, distinguishing this case from the seminal Supreme Court case of *DeShaney v. Winnebago County*.[1] Second, the Does have not complained that a compulsory-attendance public school failed to

---

[1] *See* 489 U.S. 189, 203 (1989).

No. 09-60406

protect a teenage student from an assault on school grounds *after* the close of the school day, by a teacher, coach, janitor, or any other such *state actor* who was *hired* by the school.[2] Third, the Does have not complained that a *non-compulsory school* failed to protect a student from an assault on school grounds during the school day by a private actor—as, for example, another student at school, or a visitor to the school, or even an uninvited person who furtively comes onto the school grounds and spirits the student away.[3] Thus, the instant case is distinguishable from the significant "special relationship" cases that this court, sitting en banc, has previously decided.

Finally, and perhaps most importantly to understanding their claim in the right context, the Does have not complained that a school employee or other individual *acting under color of state law* physically abused a student.[4] The constitutional violation alleged here is *not* a violation by a state actor of Jane's substantive due-process right to be free from sexual abuse and violations of her bodily integrity. Accordingly, cases involving a state actor's violation of the bodily integrity of a citizen are wholly inapposite and easily distinguishable from the instant case—a distinction that this court sitting en banc has previously recognized.[5]

To be clear, what the Does *have* alleged is that Jane's school, the Covington County Elementary School (the "School"), violated her substantive due-process rights by being deliberately indifferent to nine-year-old Jane's safety

---

[2] *See Doe v. Hillsboro Indep. Sch. Dist.*, 113 F.3d 1412, 1416 (5th Cir. 1997) (en banc).

[3] *See Walton v. Alexander*, 44 F.3d 1297 (5th Cir. 1995) (en banc).

[4] *See Becerra v. Asher*, 105 F.3d 1042, 1047 (5th Cir. 1997); *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 450 (5th Cir. 1994) (en banc).

[5] *See Hillsboro*, 113 F.3d at 1416 ("Unlike *Doe v. Taylor*, in which a school employee acted under color of state law, this case requires us to locate the primary constitutional wrong in the board and school officials.").

No. 09-60406

when the School affirmatively deprived Jane of her liberty to care for herself by forcing her into the sole custody of an unauthorized adult, Defendant Tommy Keyes, for the School's known and intended purpose of facilitating his taking her off of the School's grounds. The constitutional right at issue here is the "right to personal security," which the Supreme Court has repeatedly said "constitutes a 'historic liberty interest' protected substantively by the Due Process Clause."[6]

Specifically, the Does have alleged in minute detail that the School had a *special relationship* with (1) Jane, a pre-pubescent nine-year-old, fourth-grade student, (2) at the compulsory-attendance elementary public school, (3) in the full and sole legal custody and control of the School, to the exclusion of even her legal guardian, (4) during school hours (not at the end of the day when the School normally relinquishes its state-ordered custody)—under which relationship the School assumed responsibility for her personal safety and general well-being. The School's duty to protect Jane arises from the School's total limitation on Jane's freedom to act on her own behalf: Jane *was required* to attend the School throughout the entire school day, out of the presence of her legal guardian and without any ability to leave; and Jane's exclusive confinement by the School, entirely without the protection of her legal guardian, in combination with her very young age, made Jane *wholly dependent* on the School for her safety. The School thus assumed the duty to protect her, then allegedly violated the Due Process Clause by being deliberately indifferent to her safety.

The Does further allege that the School had a special relationship with Jane because it repeatedly handed her over to Keyes during school hours, surrendering to Keyes the School's statutorily obtained, full and exclusive custody over her, and then allowing him to take her away from the School's

---

[6] *Youngberg v. Romeo*, 457 U.S. 307, 315 (1982) (quoting *Ingraham v. Wright*, 430 U.S. 651, 673 (1977)).

4

No. 09-60406

campus to some unknown location, and isolating her from her teachers and classmates, without the School's supervision (and against her and her legal guardian's will).[7] In other words, even if the School did not already have a duty to protect very young students like nine-year-old Jane while on school grounds during the school day, it certainly *did* assume a duty to protect her when it affirmatively delivered her from the School's exclusive custody into the sole custody of Keyes, further depriving her of her liberty by isolating her from the people she trusted and the surroundings she knew. The School then allegedly violated its due-process duty to protect Jane by acting with deliberate indifference to her safety when it intentionally placed her in Keyes's custody for the explicit purpose of his taking her off campus, without verifying his identity as an identified adult authorized to check her out of the School.

Assuming as we must at this initial Rule 12(b)(6) phase of the case that the allegations of the Does' complaint are true, we conclude that they have alleged a constitutional violation and that their complaint should not have been dismissed by the district court. True, the horrific sexual abuse alleged here was committed by a private actor. But, the Does have not alleged that Keyes violated Jane's constitutional rights by sexually abusing her—and properly so, as private violence does not in and of itself amount to a constitutional violation. Rather, the Does have alleged that (1) the School so restricted little Jane's liberty that it assumed a duty to protect her from unsafe conditions, and (2) the School violated Jane's substantive due-process rights by being deliberately indifferent to her

---

[7] The dissent accuses us of "re-character[izing] the allegations in the Does' complaint and paint[ing] a picture suggesting that Jane was 'forced' by school employees into the 'custody' of Keyes" when "the complaint specifically assigns a more passive role to the school employees." Dissent at 2. The dissent, however, misreads the Does' allegation, which states that the School "allow[ed] the Defendant, *Tommy Keyes*, to check [Jane] out from school." Thus, the dissent misinterprets the Does' allegation as reading, "[t]he School [ ] 'allowed' *Jane* to leave with Keyes, rather than 'forcing' her to leave with him." *Id.* (emphasis added). This distinction is critical, and we reaffirm our position that the Does allege that the School *allowed Keyes* to take Jane out of school and, thereby, *forced Jane* into his custody.

5

No. 09-60406

safety. In those contexts, it matters not that Jane's rapist was a private actor; what does matter is that the School, an institution of the State, had a special relationship with its nine-year-old student that it violated by its affirmative acts of checking her out to an unknown and unauthorized adult, thereby involuntarily confining her, against her will, in his custody and thereby failing in its duty to protect her from such a quintessential and widely known threat to young children as pedophilia.

When the question posed is addressed in the framework thus constructed, the Does' complaint survives the Education Defendants' Rule 12(b)(6) motion. We therefore reverse the district court's dismissal of the Does' action, based on that court's holding of the absence of any duty of the Education Defendants to protect Jane, and we remand for further proceedings incorporating the special-relationship analysis as hereafter clarified.[8]

## II.  FACTS & PROCEEDINGS

### A.    Facts

The Does' complaint precisely alleges that, during the 2007-2008 school year, cognizant personnel at the School deliberately released Jane to Keyes during the school day on at least six different occasions: September 12, 2007, September 27, 2007, October 12, 2007, November 6, 2007, December 11, 2007, and January 8, 2008. Each time that Keyes checked Jane out of the School, he brutally raped, sodomized, and molested her and then returned her to the School, where the School's employees checked her back on to the school grounds.

According to the Does' complaint, the School had formally adopted and

---

[8] In deciding this appeal on the special-relationship grounds asserted in the Does' complaint, we need not and therefore do not address the slippery slope of the state-created-danger theory, also alleged therein. Neither do we address the alternative theory of liability advanced by the Does that the School's check-out policy was the "moving force" of Jane's injury, as the sole ground on which the district court denied municipal liability was its erroneous holding that the School did not have a special relationship with Jane.

No. 09-60406

actively implemented a *compulsory*[9] check-out policy, one express aspect of which was the creation and maintenance of a "Permission to Check-Out Form" (the "Form") for each student, which listed by name the only adults who were authorized to take that particular student off of the School's campus during the school day. At all relevant times, however, the School's check-out policy did not include a requirement or directive to the School's employees that they verify that any adult seeking to check out a student was who he said he was, i.e., an adult listed by name on the Form by the student's legal guardians as someone authorized to check out the student in question.

As a direct result of this "express" aspect of the policy, or of its implementation by the School's personnel charged with administering the policy, allege the Does, no employee of the School ever (1) consulted Jane's Form or (2) required Keyes to furnish identification consistent with her Form, before delegating its exclusive school-day custody of Jane to Keyes and allowing him to take her away from the School. If they had, allege the Does, they would have discovered that "Tommy Keyes" was never authorized by Jane's legal guardian to check Jane out of the School: His name was not listed on her Form; he was not related to her in any way; he never had any parental, custodial, or guardianship rights whatsoever over her. Nevertheless, according to the Does' complaint, the School repeatedly checked Jane out to this unauthorized stranger, who on multiple occasions signed her out as her father and, on at least one occasion, as her mother!

**B.     Proceedings**

In September 2009, the Does filed this action in the district court against the Education Defendants as well as against Keyes and unknown defendants. The Does advanced constitutional claims under §§ 1983 and 1985 as well as

---

[9] There is no indication in the Does' complaint that the School's young pupils—alone or even through their legal guardians—could opt out of this check-out policy.

7

No. 09-60406

claims under Mississippi law. In response, the Education Defendants filed a motion to dismiss the Does' action pursuant to Rule 12(b)(6) for failure to state a claim on which they could recover.

The district court granted that motion and dismissed the case on the ground that the Education Defendants owed no *duty to protect* Jane because (1) the Fifth Circuit has never recognized the "state created danger" theory of recovery, and (2) there was no "special relationship" between the School and Jane. As a result, the district court ruled that there was no constitutional violation for which the Does could recover from the Education Defendants. In addition, the district court granted qualified immunity to the Education Defendants.[10]

### III. ANALYSIS

#### A. Standard of Review

"We review a district court's grant of a motion to dismiss for failure to state a claim de novo, 'accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiff.'"[11] In conducting this review, we examine only the allegations within the four corners of the complaint.[12] We will not address or assume what the plaintiff may or may not find through discovery. Rather, the plaintiff must allege sufficient facts to suggest a plausible ground for

---

[10] The district court appears to have inadvertently included all Defendants-Appellees—both the municipal entities and those persons who were sued in their individual capacity—into its qualified-immunity analysis. As only natural persons who are sued in their individual capacities are entitled to qualified immunity, however, we address such immunity with regard to those defendants only.

[11] *Bustos v. Martini Club Inc.*, 599 F.3d 458, 461 (5th Cir. 2010) (quoting *True v. Robles*, 571 F.3d 412, 417 (5th Cir. 2009)).

[12] *McCartney v. First City Bank*, 970 F.2d 45, 47 (5th Cir. 1992).

relief.[13] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[14]

## B.    The Does' Special-Relationship Claim Has Facial Plausibility

### 1.    *DeShaney* Recognized a "Special Relationship" Exception for When the State Has Duty to Protect a Private Citizen against Private Violence

The Supreme Court firmly established its "special relationship" doctrine in *DeShaney v. Winnebago County*. The facts of *DeShaney* are significantly distinct from the instant case, but the Court's analysis is instructive. In *DeShaney*, state social workers became aware that a child might be the victim of abuse based on suspicious injuries. They concluded, however, that there was insufficient evidence of child abuse to retain the child in state custody, so they allowed him to be returned to his father's custody from the hospital where he was being treated.[15] Later, the father so severely beat the child that he suffered severe brain damage and fell into a life-threatening coma.[16] The child and his mother then filed a § 1983 action against the state social workers, asserting that they failed in their duty to protect the child, thus violating his substantive due-

---

[13] *See generally Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009). *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163 (1993), does not affect our analysis in this case. That case held that federal courts may not apply a heightened pleading standard in municipal liability cases. *Id.* at 166. *Iqbal* does not require a heightened pleading standard. Rather, it re-articulates Rule 8's notice pleading. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (stating that the "plausibility" standard "reflects the threshold requirement of Rule 8(a)(2) that the 'plain statement' possess enough heft to 'sho[w] that the pleader is entitled to relief'"). We have consistently applied the plausibility standard in municipal-policy suits, *see e.g.*, *Morgan v. Swanson*, 610 F.3d 877, 882 (5th Cir. 2010), and we do so again today.

[14] *Iqbal*, 129 S. Ct. at 1949 (citation omitted).

[15] 489 U.S. at 192-93.

[16] *Id.* at 193.

process rights.[17]

The Court made clear that "[a]s a general matter . . . a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause."[18] The Court identified an *exception* to this general rule, however, specifying that the State *does* have a duty to protect citizens against private violence when the State has a "special relationship" with that citizen:

> [W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being. The rationale for this principle is simple enough: when the state *by the affirmative exercise of its power* so restrains an individual's liberty that it *renders him unable to care for himself*, and at the same time fails to provide for his basic human needs—*e.g.*, food, clothing, shelter, medical care, and *reasonable safety*—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.[19]

It is, therefore, "the State's *affirmative act* of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or *other similar restraints of personal liberty*"—which constitutionally imposes on the State a duty to protect the restrained citizen from private violence.[20]

Based on the discrete facts before it, the *DeShaney* Court concluded that there was no special relationship between the social workers and the child. Even though "the State once took temporary custody of [the child]," "when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all; the State does not become the

---

[17] *Id.*

[18] *Id.* at 197.

[19] *Id.* at 199-200 (citation omitted and emphases added).

[20] *Id.* at 200 (emphases added).

No. 09-60406

permanent guarantor of an individual's safety by having once offered him shelter."[21] The Court emphasized that, despite the fact that the social workers may have had good reason to suspect that the father was a threat to the child, "[t]he most that can be said of the state functionaries in this case is that they stood by and *did nothing* when suspicious circumstances dictated a more active role for them."[22] This state *in*action was simply not enough to create a special relationship with the child.

Despite finding that the social workers did not have a special relationship with the child under those discrete facts, the Court went out of its way to make clear that the social workers *could* have had a duty to protect the child from private violence had they taken an *active* role:

> Had the State *by the affirmative exercise of its power* removed [the child] from free society and placed him in a foster home operated by its *agents*, we might have a situation sufficiently analogous to incarceration or institutionalization to give rise to an affirmative duty to protect. Indeed, several Courts of Appeals have held . . . that the State may be held liable under the Due Process Clause for failing to protect children in foster homes from mistreatment at the hands of their foster parents.[23]

Notably, this *is* one such court of appeals.[24] We have recognized that, when the State places a child in the custody of a state-approved foster home, the child "suffer[s] a deprivation of a right to personal security," in violation of the Due Process Clause, if the State violates its "affirmative duty [ ], based on a 'special relationship', to protect [the child] from violence in [that] foster home."[25]

---

[21] *Id.* at 201.

[22] *Id.* at 203 (emphases added).

[23] *Id.* at 201 n.9.

[24] *Griffith v. Johnston*, 899 F.2d 1427, 1439-40 (5th Cir. 1990).

[25] *Hernandez v. Tex. Dep't of Protective and Regulatory Servs.*, 380 F.3d 872, 880 (5th Cir. 2004).

11

No. 09-60406

Accordingly, as we address the facts alleged in Does' complaint, we must necessarily consider whether the School's repeated acts of delivering nine-year-old Jane into the exclusive custody of Keyes—on the School's premises, for the purpose of his taking her away from the School's premises—during the school day, amounted to (1) affirmative acts on the part of the State, as opposed to state inaction, and (2) a deprivation of Jane's liberty sufficient to impose on the School a duty to protect her from violence in that state–approved and facilitated private custody.

### 2. The Fifth Circuit Has Applied *DeShaney* in the School Context, Focusing on the Involuntary Aspect of the Custody and the Age and Isolation of the Student

Sitting en banc, this court has twice confronted the question whether a *DeShaney* "special relationship" exists between a minor student and his school. First, we determined in *Walton v. Alexander* that a non-compulsory state school does not have a special relationship with a student who *chooses* to attend it. There, the student voluntarily attended a state school for the deaf where he was under twenty-four-hour supervision and was subject to strict rules regarding his coming and going.[26] While attending this school, the student was sexually assaulted on school grounds by a classmate. The student then sued the school, asserting that, because of the extremely restrictive conditions imposed by that particular state school, it had affirmatively restrained his ability to care for himself and thus had a duty to protect him from his classmate's assault.

We disagreed, holding that a special relationship "only arises when a person is *involuntarily* confined or otherwise restrained against his will pursuant to a governmental order or by the affirmative exercise of state power."[27] We concluded, therefore, that the plaintiff was *not* in a special

---

[26] *Walton*, 44 F.3d at 1299.

[27] *Id.* (emphasis added).

12

No. 09-60406

relationship with the school because he voluntarily attended the school for the deaf and thus chose to be placed in the restrictive custodial condition in which he was assaulted.[28] We went on to note, however, that a special relationship does exist "when the state has effectively taken the plaintiff's liberty under terms that provide no realistic means of voluntarily terminating the state's custody *and* which thus deprives the plaintiff of the ability or opportunity to provide for his own care and safety."[29] Albeit in dicta, we thus recognized that a school does create a special relationship with a student *if it affirmatively acts to confine the student against his will, depriving him of his ability to defend himself.*

Next, we determined in *Doe v. Hillsboro Independent School District* that a compulsory-attendance middle school did not have a special relationship with its *thirteen-year-old* student who was sexually abused by a janitor *on* the school grounds *after* the close of the school day.[30] In that particular context, we "decline[d] to hold that compulsory attendance laws *alone* create a special relationship giving rise to a constitutionally rooted duty of school officials to protect students from private actors."[31] In determining that public school custody of students (at least those as old as thirteen) was not equivalent to state imprisonment or institutionalization of adults, we relied on an explanation provided by the Supreme Court:

> Though attendance may not always be voluntary, the public school remains an open institution. *Except perhaps when very young*, the child is not *physically restrained from leaving* school during school hours; and at the end of the school day, the child is invariably free

---

[28] *Id.* at 1305. As such, we did not need to confront the effect of compulsory attendance laws on the relationship between a public school and a student because the plaintiff had voluntarily attended the school for the deaf.

[29] *Id.* (emphasis in original).

[30] 113 F.3d at 1414.

[31] *Id.* at 1415 (emphasis added).

to return home. Even while at school, the child brings with him the support of family and friends and is *rarely apart* from teachers and other pupils who may witness and protest any instances of mistreatment.[32]

Thus, our reasoning in *Hillsboro* was that there is not a special relationship between a public school and its students when (1) the students are not "very young," (2) the students are not "physically restrained from leaving," and (3) the students are not apart from teachers and classmates who might help protect them. As the emphasized language in the foregoing quotation suggests, however, the converse could very well pertain, i.e., a school could have a special relationship with a student *if he (1) is "very young," (2) is "physically restrained" by (and unable to leave) the school's custody, and (3) is secluded or kept "apart from teachers and other pupils who may witness and protest any instances of mistreatment."*[33]

### 3. Under the Detailed Facts Alleged in the Does' Complaint, the School Had a Special Relationship with Jane

Taking these cases into consideration, we accept that compulsory-attendance schools (at least middle and upper schools) *alone* do not ipso facto have a special relationship with their students. But, the situation alleged in the Does' complaint is palpably distinguishable from our precedent in at least two respects: (1) unlike the student in *Hillsboro*, Jane was an elementary-school student and was only nine-years old, which is a *very young*, pre-pubescent age; and (2) unlike the school in *Walton*, Jane's school *affirmatively acted*, pursuant

---

[32] *Id.* (emphasis added and quotation marks omitted) (citing *Ingraham*, 430 U.S. at 670).

[33] We went on in *Hillsboro* to hold that, because the janitor was not acting under color of state law and there was no special relationship between the school and the student, the plaintiffs could not recover even if the school *had* been deliberately indifferent in hiring the janitor (which, we also suggested, it was not). *Id.* at 1416.

to its express check-out policy, to isolate nine-year-old Jane from her teachers and classmates and then, without her legal guardian's knowledge or consent, force her into Keyes's exclusive off-campus custody, which was even *more* restrictive than the School's on-campus custody of Jane.

### a.    Jane Was of Such a Very Young Age That She Could Not Protect Herself

As noted, the Does allege that Jane was a nine-years-old girl at the time of the School's putative constitutional violation. Up until now, we have not been faced with a case involving (1) such a young girl (2) attending a public elementary school (3) under compulsory-attendance laws. Even though in *Hillsboro*, we held that a public *middle* school does not automatically have a special relationship with its thirteen-year-old students, we nevertheless acknowledged that a public school's custodial relationship with a student might be different when very young children are involved. We recognized the truism that younger children are necessarily much more dependent on their custodians than are teenagers or adults.[34]

In our view, there is a continuum of restrictions that the State must impose on a private citizen to trigger a special relationship, the degree of which corresponds to the age and competency of the individual in question, i.e., his mental, psychological, and physical ability to recognize and defend himself against threats to his safety. For example, the Supreme Court has said that, for the State to have a special relationship with a competent adult, it must incarcerate that adult, thereby wholly depriving him of any ability to fend or

---

[34] The dissent asserts broadly that, "[u]nder our binding precedent, a public school does not have a *DeShaney* special relationship with its students requiring the school to ensure the students' safety." Dissent at 7. But, this court has never expressly held that no public school will ever have a special relationship with any student in any context. To the contrary, this court has indicated that youth, among other circumstances, may create a special relationship between a public compulsory-attendance school and its students. *See Hillsboro*, 113 F.3d at 1415.

seek care for himself.[35] When an otherwise capable and competent adult is so deprived, the State has a duty to provide him with such care and security as is necessary.[36] Likewise, when the State physically restrains an incompetent, intellectually disabled adult, it has "the unquestioned duty to provide reasonable safety," which, under the circumstances of an incompetent adult involuntarily committed to a mental institution (unlike a competent adult at a prison), includes "such training as an appropriate professional would consider reasonable to ensure [the incompetent adult's] safety and to facilitate his ability to function free from bodily restraints."[37]

In the secondary school context, we have held that an "open," compulsory-attendance, public middle school does not have a special relationship with a teenage student because "the restrictions imposed by the attendance laws upon students and parents" does not prevent parents from providing for the basic needs of their teenage children.[38] Today, however, we must consider whether, in like manner, a pre-pubescent *nine*-year-old girl's basic needs can conceivably be provided by her legal guardian while she is *at school*, or whether, instead, a public elementary school has a duty to provide for such a young girl's reasonable safety during the school day throughout which she is apart from her legal guardian—and here her teachers and classmates as well.

---

[35] *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976) ("An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met.").

[36] *See DeShaney*, 489 U.S. at 198-99 ("[B]ecause the prisoner is unable by reason of the deprivation of his liberty to care for himself, it is only just that the State be required to care for him." (citing *Estelle*, 429 U.S. at 103-04) (quotation marks and citation omitted)).

[37] *Youngberg*, 457 U.S. at 324. *See also DeShaney*, 489 U.S. at 199 ("[T]he substantive component of the Fourteenth Amendment's Due Process Clause requires the State to provide involuntarily committed mental patients with such services as are necessary to ensure their 'reasonable safety' from themselves and others." (citation omitted)).

[38] *Hillsboro*, 113 F.3d at 1415.

No. 09-60406

It cannot be debated that nine-year-old children have no real ability to fend for themselves against threatening adults. Nine-year-old children like Jane virtually never possess the will or fortitude to protest or challenge adult authority figures, particularly those whose authority is apparently endorsed by the very persons or institutions such children trust. Neither are such youngsters generally apprised of or able to recognize threats to their safety, which is why they are *never* permitted to leave the school grounds by themselves—*unlike* older teenage students who regularly come and go on their own, during, before, and after school hours. Quite simply, we conclude that nine-year-old, elementary-school students are significantly distinct from teenage, middle- and high-school students in their ability to provide for their own protection from sex offenders while they are mandatorily separated from their legal guardians—let alone when they are also separated from their regular teachers and classmates.[39]

---

[39] The dissent refers to the distinction between pre-pubescent nine-year-old, elementary-school students and post-pubescent teenage, middle- and high-school students as "arbitrary." Dissent at 14. **Congress disagrees.** *See, e.g.*, The Fair Labor Standards Act, 29 U.S.C. §§ 201-19 (setting fourteen as the minimum age for most non-agricultural work). **The legislatures of all fifty states disagree.** *See, e.g.*, Charles A. Phipps, *Misdirected Reform: On Regulating Consensual Sexual Activity Between Teenagers*, 12 CORNELL J.L. & PUB. POL'Y 373, 429-31 (2003):

> Without exception, the law in all fifty states prohibits sexual activity between an adult and a pre-pubertal child. . . . [T]he criminal law treats post-pubescent victims differently from pre-pubescent victims. While post-pubertal minors are still deemed incapable of consenting to sexual activity with adults, the fact that they have reached puberty generally translates into lower criminal penalties for those who engage in sexual activity with victims in this category. Because the age of consent in the majority of states is sixteen, this means that [this type of post-pubertal] victim generally is one aged fourteen or fifteen.

(footnotes omitted). **Society and the medical profession disagree.** *See, e.g.*, Theresa O'Lonergan & John J. Zodrow, *Pediatric Assent: Subject Protection Issues Among Adolescent Females Enrolled in Research*, 34 J.L. MED. & ETHICS 451, 454-55 (2006):

> Adolescence is, by definition, a convergence of developmental factors. Historically, the law, religion and society have implicitly applied the "rule of sevens" to assign legal and moral responsibility to children and adolescents.

No. 09-60406

Although nine-year-old students, like all elementary-school children, are picked up by or delivered to their parents at the end of the school day, we are satisfied that this has nothing to do with the duty owed to such very young students while they are in the compulsory custody of their elementary schools during the course of the school day.

Nevertheless, we need not decide whether the School had a special relationship with Jane based solely on her very young age because the School *also* affirmatively exercised its state power to restrain Jane's liberty even more. We, therefore, do not conclude, as the dissent alleges, that all elementary-school children "have a constitutionally protected liberty interest in remaining safe at school."[40]

### b. The School Affirmatively Forced Jane into Keyes's Sole Custody and Allowed Keyes to Take Her Away from the School Where She Could Not Protect Herself

The Does' complaint further alleges that, in addition to Jane's very young age, the School's adherence to its express check-out policy in checking Jane out to Keyes was an affirmative exercise of the School's power that further disabled Jane and further obliged the School to protect her. The School's check-out policy worked both to relinquish the School's custody of Jane on campus and to place

---

> Courts have treated seven-year-olds as capable of distinguishing right from wrong . . . . Likewise, religions and courts have treated fourteen-year-old adolescents as far more accountable than younger children for their actions and, in many cases, assign culpability. . . . [P]hysicians generally acknowledge that adolescents are differentially equipped to make medical decisions from thirteen years to adulthood. . . . In most states, adolescents may seek and obtain sexual and reproductive health information and services without the permission of or even notification of their parents.

(footnotes omitted). **Even Mother Nature disagrees.** *See, e.g., id.* ("Sexual development is the morphologically recognizable hallmark of adolescence. Of particular interest here is the bald fact that adolescent girls can conceive and bear children.").

[40] Dissent at 1.

18

No. 09-60406

her in the absolute custody and control of Keyes off campus. The Does allege that the Education Defendants, acting *in loco parentis*, rendered Jane all the more helpless by separating her from any possible succor that her teachers and classmates might provide and then actively delivering her to Keyes for the intended purpose of his taking her away from school grounds.

The Does assert that a nine-year-old girl is rendered entirely helpless when she is repeatedly isolated from her classmates and her teachers and then helplessly forced into the custody of an adult stranger—an adult with the apparent imprimatur of the very school that she had been taught to trust without question—in the middle of the school day. We are convinced that, as alleged, these repeated deliberate acts of the School constitute precisely the kind of "affirmative exercise of State power" contemplated in *DeShaney*. We are fully aware, of course, that in *DeShaney* the Supreme Court held that there was no special relationship when the State passively allowed a child to remain in the custody of his own natural father. But, the Court went on to make the point that *had* the state social workers *actively* assayed to place the child in the custody of a foster parent (a state-licensed, non–natural parent, private actor), the social workers might have had a duty to protect the child from private violence imposed by that private actor.[41] Thus, while there is no comparison between, on the one hand, social workers *passively* standing by while a child is returned to the custody of his *legal guardian* and, on the other hand, a public school *actively* placing a nine-year-old student in the custody of an unauthorized private actor during school hours, the Court's analysis in *DeShaney* explicitly contemplated that the State could very well have a special relationship with a child whom it actively placed in the sole custody of a private actor, as the "agent" or "delegee" of the custodial state subdivision. Again, this is *not* to say that Keyes was acting

---

[41] *DeShaney*, 489 U.S. at 201 n.9 (emphases added).

19

under color of state law; we only point out that the *DeShaney* Court recognized that, if the State had custody of a child and then *affirmatively* placed him in a non–legal guardian, private actor's custody, it might have a special relationship with that child, and it would violate the Constitution *if* it was deliberately indifferent to that child's personal security when it handed him over to that private actor.

We also reiterate that *DeShaney* defined "basic human needs" as "food, clothing, shelter, medical care, *and reasonable safety*."[42] The dissent concludes that "[t]he School did not restrain Jane's liberty to the extent that neither she nor her guardians were unable to provide for her basic needs."[43] While this may be true as to food, clothing, shelter, and medical care, we are convinced that the School, by checking young Jane out to an unauthorized adult, rendered Jane and her legal guardian unable to provide for her reasonable safety. The dissent advances the generalization that, "[n]o matter the age of the child, parents are the primary providers of food, clothing, shelter, medical care, and reasonable safety,"[44] but it notably fails to explain exactly how Jane's legal guardian could have otherwise provided for Jane's reasonable safety on the six occasions that the School checked Jane out to Keyes.

### c. Based on Jane's Very Young Age and the School's "Affirmative Exercise of State Power," the School Had a Duty to Protect Jane

We are satisfied that by itself Jane's status as a nine-year-old girl attending a compulsory-attendance elementary school could distinguish the instant case from *Walton*, *Hillsboro*, and our other school cases. But, the totality

---

[42] *Id.* at 200 (emphasis added).

[43] Dissent at 8.

[44] *Id.* at 11.

of the alleged circumstances of the School's expressly adopted check-out policy—by virtue of which the School actively and knowingly (not passively or inadvertently) forced Jane into the even *more* restrictive and unfettered custody of Keyes, not at the end but during the school day, when the School was otherwise obligated to care for Jane—convinces us that the School did indeed have a duty to protect her from precisely the kind of injuries that she suffered.

Our conclusion is consistent with that reached by the Third Circuit under a closely analogous set of facts in *Horton v. Flenory*.[45] There, a private club owner detained a man whom he suspected of burglary and began to interrogate and beat the suspect before the police arrived.[46] When a police sergeant arrived at the club, he too interrogated the suspect, but then departed, leaving the suspect in the club owner's custody pursuant to a police-department policy of allowing private clubs to detain and interrogate suspected burglars in the absence of the police.[47] Following the sergeant's departure, the club owner continued to beat the suspect, who died later that night.[48] The estate of the suspect filed a wrongful death action against the city and the sergeant in his official capacity. The case was tried to a jury, which found in favor of the suspect's estate, and the city and the sergeant appealed.[49] The Third Circuit upheld the jury verdict, explaining that the jury could have found from the evidence:

> (1) that [the city] had an official policy of letting private clubs police themselves;

---

[45] 889 F.2d 454 (3d Cir. 1989).

[46] *Id.* at 455-56.

[47] *Id.* at 456.

[48] *Id.* at 456-57.

[49] *Id.* at 455.

(2) that, acting pursuant to that policy and under color of state law, [the sergeant] left the investigation of the burglary in [the club owner's] "good hands";

(3) that [the sergeant] facilitated [the club owner] in carrying out the police function of interrogating [the suspect], by [leaving the club] and by suggesting in [the suspect's] presence that any further investigation would be done by [the club owner];

(4) that [the sergeant] was aware [the suspect] had already been mistreated and was in fear;

(5) that [the suspect] requested that he be taken from the [club] but [the sergeant] did not do so;

(6) that [the suspect] was in custody in the [club], and the denial of his request to be taken from the club confirmed both to [the club owner] and to [the suspect] that the police department approved of his continued custody there;

(7) that during that continued custody, [the club owner's] further investigation of the burglary was pursued by methods which for [the suspect] proved to be fatal.[50]

This combination of alleged facts, reasoned the Third Circuit, was "sufficient by itself to prevent judgment notwithstanding the verdict" because it established that the State, through the sergeant's actions as endorsed by the police department's official policy, had a *DeShaney* special relationship with the suspect when it delegated its exclusive lawful custody of the suspect to the non–state actor club owner.[51]

---

[50] *Id*. at 457.

[51] *Id*. at 458. The court also went on to analyze, as "a further bar to relief," whether from the evidence, the jury could have found that the State delegated to the club owner "its traditional police functions," and thereby was "responsible for a private action if the private actor [ ] exercised coercive power with significant encouragement, overt or covert, from the state." *Id*. (citation omitted). That analysis is not directly relevant here.

No. 09-60406

The factors that the *Horton* court considered in reaching its conclusion apply with equal vigor to the instant case. In fact, our conclusion, based on the detailed facts alleged in the Does' complaint, that the School had a special relationship with Jane (and a corresponding duty not to place her in the sole off-campus custody of a private actor with deliberate indifference to whether that actor was authorized by her legal guardian to have such custody of her) is supported by all of the *Horton* factors:

> (1) the School had an official policy of letting any private actor take custody of its nine-year-old students, regardless of whether the student's parents had specifically authorized that actor to do so;

> (2) acting pursuant to that policy and under color of state law, the School's officials repeatedly allowed Keyes to take Jane away from the School during the school day, leaving her completely in Keyes's "good hands";

> (3) the School facilitated Keyes in taking full and sole custody of Jane, by allowing Keyes to take her away from the School and by implying to Jane that he had a right to do so;

> (4) the School had received complaints and had internal safety meetings about its express check-out policy, so the School was aware that nine-year-old Jane's safety was threatened by (and Jane had reason to be fearful of) its checking her out to Keyes without verifying his identity;[52]

> (5) Jane's legal guardian affirmatively requested—using the Form provided by the School pursuant to its check-out policy—that only specified private actors (*not* including Keyes) be allowed to check her out, but the School still checked Jane out to Keyes six times;

> (6) Jane was in Keyes's custody, and the School's repeated allowance of her to be taken into Keyes's custody confirmed both to Keyes and to Jane that the School approved of his continued custody of her;

---

[52] That said, the Does do not allege that the School was aware that Jane had already been sexually abused when the School repeatedly checked her out to Keyes.

23

No. 09-60406

(7) during that continued custody, Keyes brutally raped, sodomized, and molested Jane.

We reach the same conclusion as did the Third Circuit, that the combination of facts alleged in the Does' complaint establishes that the School had a special relationship with Jane that is sufficient to require reversal of the district court's Rule 12(b)(6) dismissal. The Third Circuit emphasized:

> Unlike the *passive* role of the neglectful social workers in *DeShaney*, the role of the state actor here, [the sergeant], could be found from the evidence to be anything but passive. Evidence which could be credited suggests that he used his official status to confirm that [the private club owner] was free to continue the custodial interrogation even though [the suspect] was in fear for his safety and wanted to leave. Clearly, [the sergeant] was *a participant in the custody which led to the victim's death*.[53]

The same can be said for the instant case: Unlike the passive role of the neglectful social workers in *DeShaney*, the School eventually could be found from the evidence discovered to be anything but passive. Facts are alleged here, which, if proved, would suggest that the School used its official status to confirm that Keyes was free to continue checking Jane out of school and to exercise full and complete custody over her during the school day, taking her from the School to anywhere he wanted—despite the facts that (1) Keyes was not listed on Jane's Form as an adult authorized by Jane's legal guardian to take custody of her, and (2) the School either failed to use its own check-out Form to verify that Keyes was authorized or failed to verify that he was the person he claimed to be. We are thus convinced that, even if the School did not have a special relationship with Jane solely because of her very young age and compulsory attendance, it most certainly *did* have a special relationship with Jane once it affirmatively acted to restrain her liberty further by handing her over to Keyes and giving him *carte blanche* to continue his full and exclusive control of Jane away from the

---

[53] *Horton*, 889 F.2d at 458 (emphases added).

School and away from everyone else whom she knew and trusted.[54] Our conclusion is thus supported by the Third Circuit's analysis in *Horton*[55] and was apparently anticipated by the Supreme Court.[56]

### 3.    Deliberate Indifference

Because we are satisfied that the Does have alleged facts sufficient to establish that the School had a special relationship with Jane, the Education Defendants had a correlative duty *not* to be deliberately indifferent to ensuring Jane's reasonable safety. We must now determine whether the claim in the Does' complaint that the School acted with deliberate indifference to Jane's right to personal security is facially plausible.

We have stated that, "[t]o act with deliberate indifference, a state actor must consciously disregard a known and excessive risk to the victim's health and safety."[57] The Does allege that the Education Defendants consciously disregarded the known risk to Jane's safety by affirmatively enacting and maintaining a check-out policy at the core of which was a Form to be used in ensuring that only

---

[54] *See id.* ("[The private club owner] was given carte blanche to continue his custodial interrogation as a part of his investigation into a burglary, because it was the official policy of the [city's police department] to defer to private law enforcement with respect to private clubs.").

[55] Although the dissent states that "a discussion of decisions from other circuits" is "[c]onspicuously absent" from our analysis, dissent at 9, a discussion of *Horton* is conspicuously absent from the dissent's analysis with the exception of one footnote in which the dissent attempts to distinguish *Horton* on the basis of that case's alternative bar to relief, which is irrelevant to this analysis, *see id.* at 18 n.8.

[56] Originally, when the Third Circuit affirmed the jury verdict in favor of the plaintiffs in *Horton*, the Supreme Court vacated the judgment and remanded the case for further consideration in light of the Court's then-recent opinion in *DeShaney*. *Horton*, 889 F.2d at 455. On remand, the Supreme Court specifically presented the question "whether the evidence [summed up above] suffice[d] to permit a finding that [the suspect] was in state custody at the time of his fatal beating." *Id.* at 458. As explained, the Third Circuit answered in the affirmative.

[57] *Hernandez*, 380 F.3d at 880 (citations omitted).

persons authorized by the legal guardians of the pupil could check him out, then repeatedly checking Jane out to an adult without verifying his claimed identity as her father or—astonishingly, her mother—on six different occasions over a period of months.[58] The Does allege further that the Education Defendants had "actual knowledge" of the risk associated with their express check-out policy's feature of *not* verifying the identity of the adults who sought to check out the School's nine-year-old students during the school day and take them off of the School's campus:

> Upon information and belief, the Education Defendants received complaints and inquiries and/or had internal discussions and safety meetings concerning checkout policies and procedures and access to students under their care and control by unauthorized individuals. The complaints, inquiries, discussions, and/or meetings show that the Education Defendants *had actual knowledge* of the dangers created by their policies, customs and regulations, but they failed to take corrective action to reduce or prevent the danger.[59]

Accepting these alleged facts as true, as we must do at this stage of the case, we conclude that the School did act with deliberate indifference to Jane's safety by checking her out to an unauthorized adult (whom they did not know) without verifying his identity to confirm that he was authorized by Jane's legal guardian to check her out of school when they had *actual knowledge* of the substantial risk

---

[58] The dissent asserts that "[w]ithout any reason to believe that the school employee releasing Jane *knew* that Keyes was not authorized to take her from school, we simply cannot infer that the School had knowledge that it was restricting Jane's liberty or restricting her or her guardian's ability to care for her basic human needs." Dissent at 17 (emphasis in original). With respect, we believe that there is *very good reason* to believe that the School had to know that Keyes was not who he said he was when he checked Jane out as her *mother*. The School's disregarding the fact that Keyes could not physically be Jane's mother yet giving Jane over to him anyway is more than just a "careless mistake," as the dissent alleges. *Id.* at 1. Moreover, we are not talking about a one-time instance of the School's failing to verify Keyes's identity: In the face—and disregard—of its own checkout form, the School allowed an unauthorized man to take a nine-year-old girl out of its custody on *six* different occasions over a period of four months.

[59] (emphasis added).

to Jane's personal security created by this policy. The School's deliberate indifference as exhibited in its maladministration of its own check-out policy, directly and actively created a known substantial risk to Jane's safety—which tragically materialized into her repeated sexual abuse by Keyes.

The potential sexual assault of pre-pubescent children in general and nine-year-old girls in particular is hardly an unknown threat. We learned in a recent appeal,[60] for example, of a nationwide program employing an electronic tracking system to identify whether visitors to primary and secondary schools were registered sex offenders or otherwise presented threats to young students. This program was designed with the *express purpose* of combating the threat posed by pedophiles to very young children like Jane. By 2006 (the school year immediately preceding the one at issue here), this program had been endorsed by the U.S. Department of Justice, had received federal grant money, and had already been activated in at least 1,400 schools in some 100 school districts across 10 states. Our belabored point is that today's ubiquitous awareness by schools and school boards (and even the Department of Justice) of the omnipresent threat posed by deviant adults preying on very young schoolchildren—and the progressive policies that were already being adopted and implemented around the country to deal with that threat well before the incidents alleged in this case—dispel any conceivable doubt that, if the School's policy was deficient as alleged, the School's indifference to Jane personal safety had to have been *deliberate*.

We conclude then that the discrete allegations of the Does' complaint, which we must assume to be true, are sufficient to establish that the Education Defendants acted with deliberate indifference to Jane's personal security, thus violating her substantive due-process rights under the Fourteenth Amendment.

---

[60] *Meadows v. Lake Travis Indep. Sch. Dist.*, 397 F. App'x 1 (5th Cir. 2010) (unpublished).

27

## C.    Qualified Immunity

As the Supreme Court recently reiterated, "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"[61] The Court has provided (though no longer mandates[62]) a two-step inquiry to determine whether government officials are entitled to qualified immunity:

> First, a court must decide whether the facts that a plaintiff has alleged make out a violation of a constitutional right. Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was "clearly established" at the time of defendant's alleged misconduct. Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right.[63]

We hold today that the alleged facts do indeed make out a violation of Jane's substantive due-process rights by virtue of the School's special relationship with her. We hold further, however, that because—before today—we have not expressly held that a very young child in the custody of a compulsory-attendance public elementary school is necessarily in a special relationship with that school when it places her in the absolute custody of an unauthorized private actor, we cannot say that the conduct of the School's officials and employees violated a constitutional right that was clearly established at the time of their alleged misconduct. In 2007, when these violations are alleged to have been

---

[61] *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

[62] In *Pearson*, the Court specifically held "while the [two-step] sequence [ ] is often appropriate, it should no longer be regarded as mandatory. The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236.

[63] *Id.* at 232 (internal citations omitted).

committed, Fifth Circuit opinions, including those in *Hillsboro* and some district court cases,[64] might very well have implied that such schools could never be in a special relationship with its students. Even though today we clarify this circuit's position regarding the extent to which a school, by its affirmative exercise of power, may well enter into a special relationship with a very young student, those Education Defendants sued in their individual capacities did not have the guidance of today's decision in 2007. Accordingly, we affirm the dismissal of the Does' special-relationship claims against those Education Defendants who were sued in their individual capacities.

## IV.  CONCLUSION

The Does have pleaded a facially plausible claim that the School violated Jane's substantive due-process rights by virtue of its special relationship with her and its deliberate indifference to known threats to her safety. Accordingly, we (1) reverse the district court's grant of the Education Defendants' Rule 12(b)(6) motion, (2) affirm that court's qualified-immunity dismissal of the Does' special-relationship claims against those Education Defendants sued in their individual capacities, and (3) remand to the district court for further proceedings consistent herewith. As this panel's remand is limited to the extent of the further proceedings to be conducted by the district court consistent with this opinion, the panel retains cognizance of this case when and if is should return to this court.

REVERSED in part; AFFIRMED in part; and REMANDED.

---

[64] *See, e.g.*, *Doe v. Sabine Parish Sch. Bd.*, 24 F. Supp. 2d 655, 661 (W.D. La. 1998) ("In applying *DeShaney*, the Fifth Circuit has held that the type of 'special relationship' that entitles a citizen to enjoy a clearly established constitutional right to state protection from known threats of harm by private actors does not apply to the student/public-school relationship and 'only arises when a person is involuntarily confined or otherwise restrained against his will pursuant to a governmental order or by the affirmative exercise of state power.'" (quoting *Walton*, 44 F.3d at 1299)).

No. 09-60406

KING, Circuit Judge, dissenting:

To state a claim under 42 U.S.C. § 1983, the Does must allege that Jane was deprived of a liberty or property interest protected by the Fourteenth Amendment. The majority concludes that under the circumstances present in this case Jane, and other elementary schoolchildren, have a constitutionally protected liberty interest in remaining safe at school. Our en banc court, and every other circuit to consider the issue, has unequivocally concluded that public school students do not have such an interest under the Constitution. Despite clear and binding precedent to the contrary, the majority today holds that a public school may create a constitutional "special relationship" with a student when it allows her to leave the school with an adult unauthorized to take her. The majority thus elevates a school employee's careless mistake—failing to ensure that Keyes was authorized to take Jane from the School—into a constitutional violation. The majority's decision is an unwarranted expansion of the "special relationship" exception to the general rule that state actors are not required to protect individuals from private harm; therefore, I respectfully dissent.

## I. BACKGROUND

To be sure, the facts pleaded in the complaint, which we assume to be true at this stage of the litigation, recount a horrifying tale. Stripped of the majority's rhetorical flourish, the Does' complaint alleges the following facts: Nine-year-old Jane Doe attended an elementary school in Covington County, Mississippi (the "School") during the 2007–2008 school year. At some point, Jane's guardians filled out a "Permission to Check-Out Form," on which they listed the names of the people with exclusive permission to "check out" Jane from school during the school day. On six separate occasions between September 2007 and January 2008, school employees allowed a man named Tommy Keyes, who allegedly bore no relation to Jane and was not listed on her check-out form,

30

to take Jane from school. On these occasions, Keyes took Jane from school, sexually molested her, and returned her to school without the knowledge or consent of her parents or guardians. Each time Keyes took Jane from school, he simply signed her out as her father, and on one occasion he signed her out as her mother. The complaint alleges that Keyes was able to gain access to Jane because the policy promulgated by the various defendants permitted school employees to release Jane to Keyes without first verifying that he was who he said he was or whether he was among those people listed on her check-out form.

The majority re-characterizes the allegations in the Does' complaint and paints a picture suggesting that Jane was "forced" by school employees into the "custody" of Keyes. In actuality, however, the complaint specifically assigns a more passive role to the school employees. The Does allege that the School violated Jane's constitutional rights "by *allowing* the Defendant, Tommy Keyes, to check the minor child out from school" without verifying his identity. The School therefore "allowed" Jane to leave with Keyes, rather than "forcing" her to leave with him. More importantly, as I will explain below, nowhere in the complaint do the Does allege that the School or its employees had actual knowledge that Keyes was not authorized to take Jane from the School. They simply allege that school employees did not check Keyes's identification or verify that he was among the adults listed on Jane's check-out form.

Furthermore, contrary to the majority's suggestion, the Does' complaint does not allege that the school's check-out policy *required* school employees to release a student to any adult asking for her release. Rather, the complaint alleges that the policy *permitted* school employees to release students to parents without checking their identification. The policy thus delegated to school employees the discretion to release a student without verifying the adult's identity against the check-out authorization form.

31

No. 09-60406

Jane, her father, and her paternal grandmother (together, the "Does") sued the Covington County School District; the Covington County Superintendent of Education, I.S. Sanford, Jr., in his official and individual capacities; the Covington County School Board; and the President of the Covington County School Board, Andrew Keys, in his official and individual capacities (together, "Defendants"). The Does also named Tommy Keyes and other unnamed defendants in their official and individual capacities. The Does asserted claims under 42 U.S.C. §§ 1983, 1985, and 1986, as well as various state law causes of action.

On Defendants' motion, the district court dismissed the Does' federal claims for failure to state a claim and declined to exercise jurisdiction over the remaining state law claims. The court concluded that under the Supreme Court's decision in *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989), Jane had no constitutional right to be protected from harm inflicted by a private actor such as Keyes except under one of two narrow exceptions—the "state-created danger" theory and the "special relationship" exception. The district court assumed that the state-created danger theory was available in this circuit, but held that the Does had not sufficiently pleaded a violation based on that theory. The court thus determined that the "primary question" was whether the Does could state a claim based on a special relationship between Jane and Defendants, and concluded that the claim was foreclosed by Fifth Circuit precedent. For the following reasons, I would affirm the district court's judgment dismissing the Does' § 1983 claims.

## II.  DISCUSSION

### A.  *DeShaney* and the "Special Relationship" Exception

The majority's decision purports to be guided by the Supreme Court's decision in *DeShaney*. In that case, the Supreme Court stated in no uncertain terms that state actors cannot be held liable for the actions of a private actor or

32

for failing to protect an individual from harm inflicted by a private actor. 489 U.S. at 197 ("As a general matter, then, we conclude that a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause."). The Court also recognized that this general principle is subject to at least one very limited exception—when the state creates a "special relationship" with an individual—but that exception has never been extended to public schoolchildren.

1.     DeShaney *Recognizes a Limited Duty to Protect*

In *DeShaney*, Joshua DeShaney and his mother sued the Winnebago County Department of Social Services and various individual defendants when Joshua was severely beaten by his father after being returned to his father's custody following an investigation of allegations of child abuse. *Id.* at 193. Joshua and his mother alleged that the Department and its employees had violated his substantive due process rights by failing to protect Joshua from his father's violence even though they knew that he faced a very real danger of harm. *Id.* The Supreme Court held that the plaintiffs could not maintain an action under § 1983 because there had been no constitutional violation. *Id.* at 202. The Court noted that the Fourteenth Amendment was enacted to "protect the people from the State, not to ensure that the State protect[s] them from each other." *Id.* at 196. The Fourteenth Amendment "forbids the State itself to deprive individuals of life, liberty, or property without 'due process of law,' but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means." *Id.* at 195. Thus, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197.

No. 09-60406

The Court noted that this categorical rule is subject to at least one very limited exception.[1] A state may create a "special relationship" with a particular citizen, requiring the state to protect him from harm, "when the State takes a person into its custody and holds him there against his will." *Id.* at 199–200. In such instances, "the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *Id.* at 200. That "special relationship" exists when the State incarcerates a prisoner, *Estelle v. Gamble*, 429 U.S. 97 (1976), or involuntarily commits someone to an institution, *Youngberg v. Romeo*, 457 U.S. 307 (1982). The Court reasoned that

> when the State by its affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.

*DeShaney*, 489 U.S. at 200. The Court stated that "[t]he affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." *Id.*

In addition to the circumstances of incarceration and involuntary institutionalization recognized by the Court in *DeShaney*, we have extended the "special relationship" exception to the placement of children in foster care. *Griffith v. Johnston*, 899 F.2d 1427, 1439 (5th Cir. 1990). We reasoned that the

---

[1] Several courts of appeals have recognized a second limited exception, the so-called "state-created danger" theory. *See, e.g.*, *Kneipp v. Tedder*, 95 F.3d 1199, 1211 (3d Cir. 1996); *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998); *Ross v. United States*, 910 F.2d 1422, 1431 (7th Cir. 1990); *Carlton v. Cleburne Cnty.*, 93 F.3d 505, 508 (8th Cir. 1996); *Wood v. Ostrander*, 879 F.2d 583, 589–90 (9th Cir. 1989); *Uhlrig v. Harder*, 64 F.3d 567, 572–73 (10th Cir. 1995). We have to date declined to recognize the this theory. *See, e.g.*, *McClendon v. City of Columbia*, 305 F.3d 314, 325 (5th Cir. 2002) (en banc). The majority similarly purports not to address the "slippery slope" of the state-created danger theory. Majority Op. at 6 n.8.

No. 09-60406

state assumes a constitutional duty to care for children under state supervision because "the state's duty to provide services stems from the limitation which the state has placed on the individual's ability to act on his own behalf." *Id.* We have not extended the *DeShaney* special relationship exception beyond these three situations, and as I discuss below, we have explicitly held that the state does *not* create a special relationship with children attending public schools.

2.    *Schools and the Special Relationship Exception in the Fifth Circuit*

We have twice considered en banc whether the "special relationship" exception to the *DeShaney* rule applies in the context of public schools. *Doe v. Hillsboro Indep. Sch. Dist.*, 113 F.3d 1412 (5th Cir. 1997) (en banc); *Walton v. Alexander*, 44 F.3d 1297 (5th Cir. 1995) (en banc). In both cases, we concluded that a public school does not have a "special relationship" with a student that would require the school to protect the student from harm.

In *Walton v. Alexander*, a student at the Mississippi School for the Deaf, a residential public school, was sexually assaulted by a fellow student. 44 F.3d at 1299. Even though the school was a residential school, and thus responsible for fulfilling most of the students' day-to-day needs, we held that the school had not created a special relationship with the plaintiff student. *Id.* at 1305. In so holding, we reasoned that the special relationship exception applies only "when the state has effectively taken the plaintiff's liberty under terms that provide no realistic means of voluntarily terminating the state's custody *and* which thus deprives the plaintiff of the ability or opportunity to provide for his own care and safety." *Id.* In contrast, the plaintiff "attended [the] school voluntarily with the option of leaving at will." *Id.*

We next addressed the special relationship exception in *Doe v. Hillsboro Independent School District*, where we likewise held that the exception did not apply in the context of a public school. 113 F.3d at 1415. The plaintiff student in that case was thirteen years old. She was "kept after school to do special work

on her studies" and was sexually assaulted by a school janitor when she was sent to an empty area of the school to retrieve supplies for the teacher. *Id.* at 1414. We rejected the plaintiff's argument that a special relationship existed between the school and the student due to the fact that school attendance was required by state law, "declin[ing] to hold that compulsory attendance laws alone create a special relationship giving rise to a constitutionally rooted duty of school officials to protect students from private actors." *Id.* at 1415. We reasoned that "[t]he restrictions imposed by attendance laws upon students and their parents are not analogous to the restraints of prisons and mental institutions" because "[t]he custody is intermittent[,] the student returns home each day, [and] [p]arents remain the primary source for the basic needs of their children." *Id.*

Both before and after our en banc decisions, no panel of this court has ever recognized a special relationship between a public school and its students. *See Doe v. San Antonio Indep. Sch. Dist.*, 197 F. App'x 296, 298–300 (5th Cir. 2006) (finding no "special relationship" between school and thirteen-year-old special education student when student was allowed to leave with her "uncle," who later molested her); *Teague v. Tex. City Indep. Sch. Dist.*, 185 F. App'x 355, 357 (5th Cir. 2006) (finding no "special relationship" between a school and an eighteen-year-old special education student who was sexually assaulted by another special education student); *Johnson v. Dallas Indep. Sch. Dist.*, 38 F.3d 198, 202–03 (5th Cir. 1994) (no special relationship between a high school and a student shot and killed in school hallway during the school day by a boy who was not a student but had gained access to the school); *Lefall v. Dallas Indep. Sch. Dist.*, 28 F.3d 521, 529 (5th Cir. 1994) (no special relationship between a high school and a student fatally wounded by a gunshot fired in the school parking lot during a school dance).

Under our binding precedent, a public school does not have a *DeShaney* special relationship with its students requiring the school to ensure the students'

36

safety.[2] Public schools do not take students into custody and hold them there against their will in the same way that a state takes prisoners, mental health patients, and foster children into its custody. *See DeShaney*, 489 U.S. at 199–200; *Griffith*, 899 F.2d at 1439. Without a "special relationship," a public school has no *constitutional* duty to ensure the safety of the students attending the school. That is not to say that schools have absolutely no duty to ensure that students are safe during the school day. Schools may have such a duty by virtue of a state's tort or other laws. However, "[s]ection 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law." *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 450 (5th Cir. 1994) (en banc) (citation and internal quotation marks omitted). The question posed to us is whether the School, through its affirmative exercise of state power, assumed a *constitutional* duty to protect Jane. I am compelled by our precedent, and by the Supreme Court's guidance in *DeShaney*, to conclude that the School did not assume that duty. Although education is compulsory in Mississippi, Jane's guardians voluntarily sent her to public school and they were free to remove her from the School at any time. The School did not restrain Jane's liberty to the extent that neither she nor her guardians were unable to provide for her basic needs. Because the School had no duty to ensure Jane's safety, Jane had no constitutional liberty interest in being safe at school. The Does have therefore failed to state a claim under § 1983 for a constitutional violation under the "special relationship" exception.

3.    *Special Relationships in Other Circuits*

---

[2] The majority asserts that in *Hillsboro* we "indicated that youth, among other circumstances, may create a special relationship between a public compulsory-attendance school and its students." Majority Op. at 15 n.34. Aside from quoting language in *Ingraham v. Wright*, 430 U.S. 651, 670 (1977), which I address below, we referred broadly to "students," and we made no indication that our opinion applied only to middle- or high-school students. *See Hillsboro*, 113 F.3d at 1415.

No. 09-60406

Conspicuously absent from the majority's opinion is a discussion of the decisions from other circuits.  Like our court, each circuit to address the issue has concluded that compulsory attendance laws do not create a "special relationship" between public schools and their students because even though school attendance is compulsory, public schools do not place the same restraints on students' liberty as do prisons and state mental health institutions. *Hasenfus v. LaJeunesse*, 175 F.3d 68, 71 (1st Cir. 1999) (fourteen-year-old student attempted suicide after being sent unsupervised to a locker room); *D.R. v. Middle Bucks Area Vocational Technical Sch.*, 972 F.2d 1364, 1371–72 (3d Cir. 1992) (en banc) (sixteen-year-old student was sexually assaulted by fellow students in a unisex bathroom and darkroom, both of which were part of a classroom where a teacher was present during the attacks); *Stevenson ex rel. Stevenson v. Martin Cnty. Bd. of Educ.*, 3 F. App'x 25, 31 (4th Cir. 2001) (ten-year-old student assaulted by his classmates); *Doe v. Claiborne Cnty., Tenn.*, 103 F.3d 495, 510 (6th Cir. 1996) (fourteen-year-old student sexually assaulted by an athletic coach off school grounds); *J.O. v. Alton Cmty. Unit Sch. Dist. 11*, 909 F.2d 267, 272–73 (7th Cir. 1990) (teacher sexually molested two "school-age children"); *Dorothy J. v. Little Rock Sch. Dist.*, 7 F.3d 729, 734 (8th Cir. 1993) (mentally retarded high school boy was sexually assaulted by another mentally retarded student); *Patel v. Kent Sch. Dist.*, — F.3d —, 2011 WL 2684939, at *6–7 (9th Cir. July 11, 2011) (developmentally disabled high school student was sexually assaulted by a classmate when she was permitted to use restroom alone even though her parents specifically requested that she be under adult supervision at all times due to her disability); *Maldonado v. Josey*, 975 F.2d 727, 732–733 (10th Cir. 1992) (eleven-year-old boy died of accidental strangulation in an unsupervised cloakroom adjacent to his classroom); *Wyke v. Polk Cnty. Sch. Bd.*, 129 F.3d 560, 569 (11th Cir. 1997) (thirteen-year-old boy committed suicide

a few days after an unsuccessful attempt and school officials never told his parents of the attempt).

As the forgoing cases demonstrate, other circuits have addressed this issue under a wide variety of circumstances. The claims have involved children as young as ten, children with developmental disabilities, and children left alone without supervision. Yet, invariably, each circuit has held that public schools do not have a *constitutional* duty to protect students from harm, whether that harm is inflicted by a school employee, a fellow student, or the student himself. The majority thus makes ours the only circuit to recognize such a duty.

## B.    The Majority's Theory of Liability

Against this backdrop, and the many decisions to the contrary, the majority concludes that Jane had a constitutionally protected liberty interest. According to the majority, the stars have aligned and created just the right set of circumstances that expose the School to constitutional liability. The majority relies on two factors for its conclusion that the School created a "special relationship" with Jane that required the School to protect her from harm: (1) Jane's "*very young*, prepubescent age"; and (2) that the School affirmatively acted to "force" Jane into "Keyes's exclusive off-campus custody." Majority Op. at 14–15. Neither of these factors provides a basis to conclude that the School assumed a constitutional duty to protect Jane. The majority both exaggerates the allegations in the Does' complaint and ignores the contours of the "special relationship" exception to create a cause of action where none exists.[3]

---

[3] The majority also contorts a statement made by the Supreme Court in a wholly different context in *Ingraham v. Wright*, 430 U.S. 651 (1977), into a suggestion that the Court would find a special relationship in this case. Majority Op. at 13–14. Addressing claims brought by a group of students alleging that corporal punishment in public schools was prohibited by the Eighth Amendment, the Court stated that "[t]he schoolchild has little need for the protections of the Eighth Amendment" because "the public school remains an open institution." *Ingraham*, 430 U.S. at 670. The Court then listed a number of reasons why schools are open institutions, and the majority assumes that the converse of each reason must result in a school that is a closed institution. Yet the Court did not suggest that a public

No. 09-60406

1.    *Jane's Young Age*

The majority reasons that Jane's young age distinguishes this case from the many others in which we have held that schools have no special relationship with their students. The majority suggests that because nine-year-old children "are *never* permitted to leave the school grounds by themselves," and because they "virtually never possess the will or fortitude to challenge adult figures," public schools are constitutionally required to ensure their safety during the school day. Majority Op. at 17. Neither contention is sufficient to distinguish this case.

The majority contends that, because of her age, the School placed greater restrictions on Jane's liberty and that these additional age-appropriate restrictions were sufficient to create a special relationship. Our en banc precedent directly contravenes the majority's contention. We have said that schools do not have a special relationship with students because "[p]arents remain the primary source for the basic needs of their children." *Hillsboro*, 113 F.3d at 1415. This is as much true for elementary students as it is for high school students. Nevertheless, the majority states that the fact that elementary school students return to their parents' care at the end of each school day "has nothing to do with the duty owed to such very young students while they are in the compulsory custody of their elementary schools during the course of the school day." Majority Op. at 18. No matter the age of the child, parents are the primary providers of food, clothing, shelter, medical care, and reasonable safety for their minor children. Thus, the fact that *all* public school students return to

---

school is no less an open institution if a student is restrained from freely leaving the school due to her young age or if a student is apart from teachers or other students, whether on campus or off. Indeed, in an opinion written far more recently than *Ingraham*, the Court explicitly stated in dicta that its opinion should not be read to "suggest that public schools as a general matter have such a degree of control over children as to give rise to a constitutional 'duty to protect.'" *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 655 (1995) (citing *DeShaney*, 489 U.S. at 200).

No. 09-60406

their parents' care at the end of each day has everything to do with the duty owed to them by the school.

The majority also contends that Jane's attendance at the School was somehow more compulsory than if she were a teenager, which distinguishes this case from *Walton* and our other cases holding that compulsory attendance laws are insufficient to create a special relationship because the School had "compulsory custody" of Jane.[4] Majority Op. at 18. But Jane's young age does not alter the voluntary nature of her attendance at the School. While it may be true that elementary school students are subject to more rules during the school day, their attendance at school is no more or less mandatory than teenagers' attendance.[5] In *Walton*, we held that there was no special relationship in part because the plaintiff student *voluntarily* attended a residential school for deaf children. Jane's attendance at her school was no less voluntary. The fact that Jane's parents sent her to a public elementary school, rather a residential school for deaf children, does not alter the voluntary nature of Jane's attendance at that school.

---

[4] The majority implies several times that the School had "exclusive" custody of Jane. The complaint does not allege this fact and it is simply untrue. Jane's parents were free to retrieve her from the School at any time; they were not "excluded" from the School or prevented from providing care of any kind to Jane. This is in stark contrast to the "exclusion" her parents would encounter if Jane were incarcerated, institutionalized, or placed in foster care.

[5] The majority appears to have assumed that the rules and restrictions governing elementary school students are necessarily more restrictive than those governing middle school and high school students. Majority Op. at 17 ("[Nine-year-old children] are *never* permitted to leave the school grounds by themselves—*unlike* older teenage students who regularly come and go on their own, during, before, and after school hours."). While these assumptions may be intuitive, the record is devoid of any evidence or factual allegations regarding the level of freedom accorded to elementary school students *vis à vis* older students while they are at school. Indeed, the high school in *Doe v. San Antonio Independent School District* had in place "a non-discretionary release policy that provided that a student may only be released to a parent or legal guardian, a police authority, or a person who a parent had designated by written request." 197 F. App'x at 298.

41

No. 09-60406

In fact, Jane was subject to the exact same Mississippi compulsory education laws as the plaintiff in *Walton*. Mississippi requires parents to enroll their children in school until age seventeen. Miss. Code Ann. § 37-13-91(3). Parents may fulfill this obligation in any number of ways, only one of which is to enroll their children in public school. *See id.* I am not unaware that for the vast majority of parents in Mississippi, the only way for them to fulfill their obligation is to enroll their children in public school. But that practicality does not alter the fact that Jane's parents voluntarily sent her to the School as a means of fulfilling their obligation to educate her. Jane's parents were free at any time to remove Jane from the School if they felt that her safety was being compromised. This reality is a far cry from the situation of incarcerated prisoners, institutionalized mental health patients, or children placed in foster care. Mississippi's compulsory education law is therefore insufficient under our precedent to create a special relationship between the School and Jane, despite Jane's young age.

Jane's immaturity is also insufficient to distinguish this case from *Walton* and *Hillsboro*. The majority holds that "there is a continuum of restrictions that the State must impose on a private citizen to trigger a special relationship," suggesting that we ought to examine an individual's characteristics to determine whether the state has assumed a duty to care for her. Majority Op. at 15. This approach is unsupported by precedent. Far from a continuum of restrictions, the situations in which the state assumes a duty of care sufficient to create a special relationship are strictly enumerated and the restrictions of each situation are identical. In the cases of incarceration, institutionalization, and foster care, the state has rendered the person in its care completely unable to provide for his or her basic needs and it assumes a duty to provide for these needs. Neither the Supreme Court nor this court has ever suggested that anything less than such a total restriction is sufficient to create a special relationship with the state,

42

regardless of the age or competence of the individual. *See DeShaney*, 489 U.S. at 200 ("The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf.").

Particularly instructive on this point is the Ninth Circuit's recent decision in *Patel v. Kent School District*, 2011 WL 2684939. There, a developmentally disabled student had several sexual encounters with a classmate in a restroom adjacent to her classroom. *Id.* at *2. The student's parents had requested that she remain under adult supervision at all times because her disability prevented her from recognizing dangerous situations and caused her to be overly friendly with others. *Id.* at *1. Nevertheless, the student's teacher allowed her to use the restroom alone in order to foster her development. *Id.* at *2. The Ninth Circuit held that compulsory school attendance laws do not create a "special relationship" between public schools and students that would require schools to protect the students from harm. *Id.* at *7. Of particular import to this case, the Ninth Circuit also rejected the student's contention that the school was required to protect against her "special vulnerabilities." *Id.* The court reasoned that "[i]n the case of a minor child, custody does not exist until the state has so restrained the child's liberty that the parents cannot care for the child's basic needs," and the student's disability did not prevent her parents from caring for her basic needs. *Id.* Under the Ninth Circuit's reasoning, a special relationship does not depend on the characteristics of the individual. Therefore, Jane's young age and immaturity do not warrant a special relationship for anything less than a total restriction on her liberty such as placement in foster care or involuntary institutionalization.

Even more troubling is the majority's seemingly arbitrary distinction between the thirteen- and fourteen-year-old students in *Walton* and *Hillsboro*

and nine-year-old students like Jane. Without citation to any evidence in the record or otherwise the majority declares that "[n]ine-year-old children like Jane virtually never possess the will or fortitude to protest or challenge adult authority figures" and that "such youngsters [are not] generally apprised of or able to recognize threats to their safety." Majority Op. at 17. If thirteen-year-old children do have these traits, but nine-year-old children do not, we are left to wonder when, exactly, children acquire these traits for constitutional purposes.[6] Do schools need to evaluate the maturity of each student to determine whether the school has a "special relationship" with that student? What about mentally disabled students? In other cases involving children with a variety and range of limitations, courts have not considered a student's particular characteristics as a factor in the analysis. *See, e.g.*, *Patel*, 2011 WL 2684939, at *1 (noting that the plaintiff "had difficulty maintaining an appropriate physical distance from other people, refraining from talking about personal or embarrassing things, and conveying an age-appropriate understanding of etiquette"); *Middle Bucks*, 972 F.2d at 1371–72 (noting, but not taking into consideration, the fact that "parents have even greater involvement" in the education of special education students). A constitutional duty to protect a student from harm should not depend on the maturity of the student, a factor not in the control of the state; rather, it depends

---

[6] I do not suggest, as the majority seems to believe, that there are no developmental differences between nine-year-old students like Jane and thirteen-year-old students like the plaintiff in *Hillsboro*, but the majority curiously implies that puberty is the point at which schools no longer have a constitutional duty to protect young students. Majority Op. at 17 n.39. First, there is no allegation in the complaint to suggest that Jane actually was pre-pubescent at the time of the abuse in this case, nor is there any indication that the thirteen-year-old plaintiff in *Hillsboro* was at a different developmental stage than Jane. Second, the majority points to no evidence that the onset of puberty is linked to whether a child "possess[es] the will or fortitude to protest or challenge adult authority figures" or is "apprised of or able to recognize threats to [her] safety." Majority Op. at 17. While I abhor the thought that another child will endure the abuse that Jane has suffered, a court faced with a similar plaintiff who is between the ages of nine and thirteen is left with no guidance under the majority's opinion to determine whether the school had a constitutional duty to protect that child.

on the level of care the state has affirmatively undertaken to provide, a factor that is in the control of the state. Through their public school systems, states take on the responsibility of educating students, but, no matter the age of the student, public schools simply do not take on the responsibility of providing "food, clothing, shelter, medical care, and reasonable safety" for the students they educate by virtue of compulsory attendance laws. *See DeShaney*, 489 U.S. at 200.

While we should have every reason to expect that public schools can and will provide for the safety of public school students, no matter their age, our precedents, and the decisions of every other circuit to have considered this issue, dictate that in almost every circumstance schools are simply not *constitutionally* required to ensure students' safety. Despite her young age, Jane was not attending the School through the "affirmative exercise of State power"; she was attending the School because her parents voluntarily chose to send her there. Moreover, Jane's young age did not prevent her parents from caring for her or providing for any of her basic needs.

2.    *Allowing Jane to Leave with Keyes*

The majority holds that, if a child is as young as Jane, a public school may create a special relationship with the student, and assume a duty to care for that student, "if the State had custody of a child and then *affirmatively* placed him in a non-legal guardian, private actor's custody." Majority Op. at 20. In so holding, the majority equates the School's act of releasing Jane to Keyes with a state's act of placing a child in foster care, in that the School placed her in the custody of an adult who was not her parent and during which custody her parents could not care for her basic needs. Even assuming that the school had custody over Jane to the exclusion of her legal guardians, which it did not, the School did not *knowingly* transfer that custody to an unauthorized individual. The complaint alleges that the school employee releasing Jane committed an

affirmative act, but what is missing is any allegation that the school employee actually knew that Keyes was unauthorized to take Jane from school. Instead, the complaint alleges that the school employees were "deliberately indifferent" to the risk that Keyes was unauthorized; it does not allege that the school employees had actual knowledge that Keyes was unauthorized. The School's "deliberate indifference" is insufficient to create a special relationship between the School and Jane.

Implicit in the Supreme Court's holding that a state may create a special relationship through an "*affirmative exercise* of its power" is the state actor's knowledge that it is restricting an individual's liberty. When a state incarcerates a prisoner, institutionalizes a mental health patient, or places a child in foster care, the state undoubtedly knows that it has restricted the individual's liberty and rendered him unable to care for his basic human needs. When a school employee carelessly fails to ensure that an adult is authorized to take an elementary student from the school, no state actor has knowledge that the school has restricted the student's liberty to any degree because the adult taking the student from school may or may not be authorized. Under the majority's opinion, an employee's failure to check the adult's identification will not always result in a corresponding duty to ensure the student's safety; rather, that duty arises only when that failure results in the child being released to an unauthorized adult. Without any reason to believe that the school employee releasing Jane *knew* that Keyes was not authorized to take her from school, we simply cannot infer that the School had knowledge that it was restricting Jane's liberty or restricting her or her guardian's ability to care for her basic human needs. That a public school could assume a duty without having actual knowledge that it was restricting a student's liberty to such a degree that it

46

would assume constitutional a duty to care for that student is an unprecedented expansion of the Fourteenth Amendment.[7]

The majority implicitly suggests that the School did have actual knowledge that Keyes was not authorized to take Jane from the School by referring to Keyes as an "unknown and unauthorized adult," an "unauthorized stranger," and an "adult stranger." Majority Op. at 6, 7, 19. There are absolutely no facts in the complaint to suggest that Keyes was a stranger or unknown to either the school employees or to Jane. The majority also states several times that Jane was "forced" to leave the School with Keyes "against her will." Majority Op. at 4, 5, 6, 15, 18, 19, 21. The majority's colorful language twists the facts as alleged in the complaint. The complaint contains no suggestion that the school employees had to force Jane to leave against her will; it alleges that Jane was "allowed" to leave with Keyes. The complaint therefore does not allege facts from which we can even infer that the School had actual knowledge that Keyes was not authorized to take Jane from  school.[8]

---

[7] The majority states that if a school creates a special relationship with a student, "[the school] would violate the Constitution if [the school] was deliberately indifferent to that child's personal security when it handed him over to [a] private actor." Majority Op. at 20. This statement appears to suggest, illogically, that the same act that creates the special relationship can also violate the duty of care owed to the student. This confuses  the act of creating a special relationship with the violation of the duty to protect once the special relationship is created. Under the special relationship exception, the state assumes a duty to care for and protect an individual. Once the special relationship is created, it is the failure to fulfill that duty that gives rise to a constitutional violation. An allegation of deliberate indifference may be sufficient to *violate* a constitutional duty, but it is not sufficient to *create* the constitutional duty.

[8] For this reason, even if we were to subscribe to the Third Circuit's decision in *Horton v. Flenory*, 889 F.2d 454 (3d Cir. 1989), this case is distinguishable.  In *Horton*, the court concluded that the plaintiff was in *de facto* police custody because "[the city] delegated to [the club owner] its traditional police functions." *Id.* at 458.  There is no question that suspects in police custody  are in a special relationship with the state requiring the state to ensure their reasonable safety. *See, e.g.*, *Scott v. Moore*, 114 F.3d 51, 53–54 (5th Cir. 1997) (en banc). In *Horton*, the police officer who left the plaintiff in the custody of the club owner *knew* that the plaintiff "had already been mistreated and was in fear" and thus knew that the plaintiff's liberty had been restricted and knew of the danger of leaving the plaintiff alone with the club

No. 09-60406

## C.    The Does' Remaining Theories of Liability

Having concluded that the School had no special relationship with Jane that imposed on the School a constitutional duty to protect her from harm, I turn to the Does' remaining theories of liability. The Does also assert that liability can be predicated on the "state-created danger" theory of liability. After *DeShaney*, some circuits used the following language in the Court's opinion to provide a basis for § 1983 liability for harm inflicted by private actors:

> While the State may have been aware of the dangers that Joshua faced in the free world, *it played no part in their creation, nor did it do anything to render him any more vulnerable to them.* That the State once took temporary custody of Joshua does not alter the analysis, for when it returned him to his father's custody, *it placed him in no worse position than that in which he would have been had it not acted at all* . . . .

*DeShaney*, 489 U.S. at 201 (emphases added). Under the state-created danger theory, a state actor may be liable under § 1983 if the state actor created or knew of a dangerous situation and affirmatively placed the plaintiff in that situation. *See, e.g., Carlton v. Cleburne Cnty.*, 93 F.3d 505, 508 (8th Cir. 1996) ("In [the state-created danger] cases the courts have uniformly held that state actors may be liable if they affirmatively created the plaintiffs' peril or acted to render them more vulnerable to danger. In other words, the individuals would not have been in harm's way but for the government's affirmative actions." (internal citation omitted)).

---

owner. 889 F.2d at 457.

Here, the majority suggests that "the School was aware that nine-year-old Jane's safety was threatened by (and Jane had reason to be fearful of) its checking her out to Keyes without verifying his identity." Majority Op. at 23. However, the complaint alleges that the School was aware of the risk of harm, not that the School knew it was releasing Jane to an unauthorized adult. Again, an allegation that the School was deliberately indifferent to the risk may be sufficient to allege a violation of a constitutional duty imposed by a special relationship, but it is not enough to create such a duty.

48

Unlike almost all other circuits, we have never explicitly adopted the theory. *See, e.g., McClendon v. City of Columbia*, 305 F.3d 314, 325 (5th Cir. 2002) (en banc). The district court in this case acknowledged that this circuit has never expressly recognized the state-created danger theory, but held that even if the theory were recognized, the Does had failed to properly plead facts that amounted to a constitutional violation. The court held that the Does had not alleged that Defendants knew that their policy would allow Jane to be checked out of school by an unauthorized adult and sexually assaulted; therefore, they had not alleged that Defendants were deliberately indifferent to a known danger. I agree that the Does have not sufficiently stated a claim under the state-created danger theory because they did not plead that Defendants knew their policy would lead to a constitutional violation. Such knowledge is required before Defendants may be subject to municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). *See Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001) (holding that to establish municipal liability under *Monell*, a plaintiff must allege that a facially innocuous policy "was promulgated with deliberate indifference to the 'known or obvious consequences' that constitutional violations would result" (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 407 (1997)).

Of course, this assumes that a state actor can be held liable under the state-created danger theory in this circuit. Even if the factual allegations were sufficient, we still must find that Jane was deprived of a constitutional right when the school released her to Keyes, i.e., when the school placed her in a dangerous situation. Given that this circuit has studiously avoided recognizing the state-created danger theory as a valid cause of action, I am certainly not prepared at this point to conclude that Jane had a constitutional right not to be

released to Keyes.[9]  Therefore, I would affirm the district court's judgment dismissing the Does' complaint for failure to state a claim under the state-created danger theory.

The Does also assert that municipal liability is available under *Monell* because the School promulgated a policy—the ineffective student check-out policy—that was the moving force behind Jane's injury.  In asserting this theory, the Does ignore the principle that a municipality may be liable only if its policy was "the moving force of [a] constitutional violation."  *Monell*, 436 U.S. at 694 (emphasis added).  We have stated time and again that "[w]ithout an underlying constitutional violation, an essential element of municipal liability is missing." *Becerra v. Asher*, 105 F.3d 1042, 1048 (5th Cir. 1997).  Thus, even if the ineffective check-out policy was the moving force behind Jane's injury, there can be no § 1983 liability unless Jane suffered a constitutional violation.  Jane did not suffer a constitutional violation at the hands of Keyes because private actors cannot commit constitutional violations.  The only state actions that could give rise to a constitutional violation in this case are the School's failure to prevent Keyes from injuring Jane or the act of allowing Jane to be placed in a dangerous

---

[9] I note that the majority's standard for creating a "special relationship" in this case is strikingly similar to the standard under the state-created danger theory.  Although we have never adopted the state-created danger theory as a basis for liability, we have articulated the elements of such liability: (1) "[T]he environment created by the state actors must be dangerous"; (2) "they must know it is dangerous"; and (3) "they must have used their authority to create an opportunity that would not otherwise have existed for the third party's crime to occur." *Johnson v. Dallas Indep. Sch. Dist.*, 38 F.3d 198, 201 (5th Cir. 1994).  The distinction between a constitutional special relationship and a state-created danger is that, in creating a special relationship, the state assumes an ongoing duty to provide for all of an individual's basic needs as a result of restricting the individual's liberty, whereas under the state-created danger theory a state actor assumes a duty to protect an individual from harm by virtue of the state actor having placed that individual in harm's way, i.e., to provide for the individual's safety.  Under the majority's opinion, the School had a duty to protect Jane from harm because it placed her in a potentially harmful situation when it released her to Keyes. *See* Majority Op. at 20.  The majority never suggests that the School undertook to provide for *all* of Jane's basic needs.

situation. As demonstrated above, these acts, or non-acts, do not give rise to a constitutional violation under either the special relationship exception or the state-created danger theory. Therefore, the School cannot be liable under *Monell* because the check-out policy was not the moving force behind a constitutional violation.

### III.  CONCLUSION

In concluding that the Does have failed to state a claim for a constitutional violation, I do not suggest that schools ought to allow students to leave with unauthorized adults. The question is simply whether the school's failure to check Keyes's identity and be sure that he was authorized to take Jane amounted to a *constitutional* violation. Supreme Court precedent, our precedent, and the decisions of every other circuit to address the special relationship exception compel me to conclude that it does not. In addition, the state-created danger theory does not provide a basis for liability. For these reasons, I would affirm the district court's judgment dismissing the Does' complaint for failure to state a claim under § 1983.